UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT DISTRICT of Connecticut

*United States District Court*
*District of Connecticut*
*FILED AT   BRIDGEPORT*

REALTOR, on behalf of The UNITED STATES
OF AMERICA, U.S. Department of Education,
Federal Trade Commission, Consumer Finanical
Protection Bureau; U.S. Treasury Department,
Internal Revenue Service; States of California,
Connecticut, Florida and New York,

                  RELATOR AND PLAINTIFFS,

VS.

Navient Department of Education, U.S. Department
of Education/PA; Navient (Sallie Mae), Navient
Michele Ahmad, Navient Consumer Advocate
Education Management Corporation; Education
Management Holdings LLC, Educational Credit
Management Corp., Inc., Pam Esaw, ECMC
Resolution Advocate; Navient's Melanie Engberg
Assistant Vice President Compliance Department
and Student Assistance Foundation, collectively
as *'the Enterprise'*; AlliedInterstate, TransWorld
Inc., LLC., Account Control Technologies, Inc.,
collectively as *'the Agencies*; New York College
of Health Professions, Rezen Akpnar, Dr. Steve
Haffner; Pacific College of Oriental Medicine,
Atlantic Institute of Oriental Medicine, Canadian
College of Naturopathic Medicine, Laura Sun, Financial
Aid Representative of CCNM and University
of Bridgeport College of Naturopathic Medicine, John Doe
Academic Board Director, Professor Gaulton, and Dr.
Zamprino, Collectively as University of Bridgeport
College of Naturopathic Medicine & Academic Board
and all *Academic Institutions*' ad AI.

                  DEFENDANTS.

CIVIL ACTION NO.

3:16cv1199 (AWT)

FILED UNDER SEAL
31 U.S.C. §§ 3729-32

JURY DEMANDED

FASLE CLAIMS QUI TAM WHISTLEBLOWER FEDERALLY INSURED EDUCATION
LOANS UNDER THE U.S. HIGHER EDUCATION ACT OF 1965; ITS AMENDMENTS, et al.

Civil Racketeering Influence Corrupt Practices Act mail, wire and extortion fraud in collection an unlawful debt,
Sabine Oxley Act violations – Internal Control Failures and Whistleblower Retaliation Sealed Complaint Involving
U.S. Higher Education Act of 1965 Program Participation Agreement Violations; Breached Fiduciary Duty Owed
Government; False Student Loan certifications, Material Misrepresentations of academic program catalogue,
academic cheating, demand for payment of unlawful debt paid from Government by defendants

TABLE OF CONTENTS

Jurisdiction and Venue ................................................. 1

Introduction ................................................. 2

    Relator's Disclosures ................................................. 2

        AI's Academic Integrity – Cheating on Exams ................ 4

        MPN Unauthorized Use Cause Identity Theft of AI's ........ 5

        Whistleblower Retaliation – Sabine Oxley Violation ........ 7

        B.    PPA's Scope and Independent Contractor's Compliance ........ 9

        C.    Systemic Compliance Failures – Exit Counseling ........ 9

        D.    Master Promissory Note: Promise to Reply
             Implied Authorization ................................. 10
Racial Discrimination in Education – Expelled for Being "Impolite' ........ 13

    Weak Internal Controls, Unauthorized Debt Claims Are Malicious ........ 16

FACTS ................................................. 18

    Flowchart 1 – University of Bridgeport Program Integrity Violations
    Of PPA 2002-2004 Catalogue Misrepresented, Academic Cheating ........ 19
    Flowchart 1 – Narrative ................................. 20-21

    Flowchart 2 – Canadian College of Naturopathic Medicine Attendance
    And Tuition Confirmed; Servicer/Lender failed to Validate ........ 22
    Flowchart 2 – Narrative ................................. 23

    Flowchart 3 – Atlantic Institute of Oriental Medicine, (ATOM) ........ 24
    Flowchart 3 – Narrative ................................. 25

    Flowchart 4 – Pacific College of Oriental Medicine, (PCOM) ........ 26
    Flowchart 4 – Narrative ................................. 27

    Flowchart 5 – New York College of Health Professions (NYCHP) ........ 28
    Flowchart 5 – Narrative ................................. 29

    Summary of Flowcharted Illustrations A – AI's False Certifications ........ 30

    Flowcharted Illustrations 1 – 20 U.S.C. Code §1080 Defaulted of Student
    Under Federal Loan Insurance Program ................................. 31 -32

Flowcharted Unlawful Debt Collection Used Mail, Wire, Extortion and
Retaliation Towards Relator – RICO & Sabine Oxley – Failed Internal
Controls                                                                         33 –34

    B.      False Material Misrepresentations By Enterprise and Agencies
             to Government Investigators violates 18 U.S.C. §1001           34– 35

PARTIES                                                                          36

# COMPLAINT

**COUNT 1 False Claims Act Whistleblower – Academic Institutions**               37

  A.  Government Requires PPA to Comply with Program Integrity            40
  B.  Connecticut State Education Laws in UBCNM's Catalogue on
      Basic Scientific Courses                                           41
  C.  Connecticut's Definition: Fraudulent Intentional Misrepresentation   42
  D.  Material Misrepresentations in UBCMN's 2002-2004 catalogue
      And Its Educational Delivery                                       43

      c.  Connecticut Education Law 10-145(d)-613(a)(1) and (5) Grounds
         To Revoke Permit                                                43
      d.  UB Knew in 2002 that its Catalogue Was Untrue, It Mislead
         Relator in 2003 Willfully – Violation of 10-145(d)-613(a)(1)    44
      e.  UBCNM's 2002-2004 Catalogue, Relator Relied Upon              45
      f.  Connecticut Education Law 10-145(d)-613(a)(5) Academic
         Integrity (Cheating) Between 2002 – 2004                        46
      h.  Anatomy 1 – Cheating Facilitated 75/100 Practice Exam
         Used On Test                                                    50
      i.  Professor Resigned, Relator Withdrew; Transferred to CCNM     50
      j.  Substantial Misrepresentations: No Gainful Employment          51
      k.  Breached Public Trust and Consume Protection of Connecticut    51
      l   Connecticut: Consumer Protection, Unfair Trade Practices Laws   51
      m.  Accreditation Body: New England Association of Schools and
         Colleges (NEASC)                                                52
      n.  Policy Statement: Institutional Effectiveness                  52
      o.  Policy Statement: Student Achievement & Success                53
      p.  Accreditation:  Public disclosure                             55

  P.  U.S. Department of Education's PPA Duties and Defense to Repay
     Supported Under State Laws                                         56
In Conclusion                                                                    57

R.    AI's Used Relator's MPN Without Consent                          58

In Conclusion                                                         63

## COUNT 2 – LENDERS

A. Lender Breached Its Fiduciary Duty to DOE; E-Sign Act and
   Authentication of Relator's Master Promissory Note MPN            64

B. Relator's MPN Was Used Without Consent                            65

C. Lender and PCOM Breached E-Sign Act and Their PPA
   Duties Owed Government                                            67

D. Lender and ATOM Breached E-Sign Act and Their PPA
   Duties Owed Government                                            67

E. Lender and CCNM Breached E-Sign Act and Their PPA
   Duties Owed Government                                            67

F. Attribution Was Not Established by Lender of Holder of
   Relator's Loans                                                   68

G. Authenticating Relator's Identity Did Not Occur                   68

H. Timeframe To Provide Access Must Be Reasonable; It Was
   Not Reasonable                                                    69

## COUNT 3 – COLLECTION OF UNLAWFUL DEBT

Lender, Holder or Current Holder Demand Repayment For Loans Relator
Did Not Consent or Authorize and Was Not Attending Academic
Institution When Certified                                           69

## III SERVICERS

Servicers violated their PPA's                                       71– 77

IV.   ECMC Made Fraudulent and False Statements To Confiscate Federal
      Tax Refund; Garnish SSA Retirement Income                      77 -79

V.    Credit Reporting & Debt Collection Agencies                    79

VI.   Un-validated False Entries Enterprise Placed Onto Relator's
      National Credit Report(s)                                          80


## COUNT 4 – CIVIL RACKETEERING INFLUENCE CORRUPT PRACTICES ACT

   The Purpose of RICO                                                   82

   The Elements of a RICO Claim                                          82


## COUNT 5 – OBSTRUCITING ADMINISTRATIVE PROCEEDINGS

   18 U.S.C. §1501                                                       85

## COUNT 6 – FALSE STATEMENT MADE TO FEDERAL ADMINISTRATIVE INVESTIGATORS

   18 U.S.C. §101                                                        89

## COUNT 7 – CONSPIRACY TO DEFRAUD THE UNITED STATES

   18 U.S.C. §371                                                        90

Requested Relief                                                        93

Certificate of service                                                  94

Exhibits 1 thru 14 (Redacted and Un-redacted separately packaged)

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §1332(a)(1) because the Plaintiff and Defendants are citizens of different states, the amount in controversy exceeds $75,000; additionally,  diversity jurisdiction 28 U.S.C. § 1332 applies when federal-question jurisdiction exists over issues arising under federal law which constitutes the two primary categories of subject matter jurisdiction in U.S. federal courts.

Further, this court has jurisdiction under the False Claims Act 31 U.S.C. §§ 3729–3733, also called the "*Lincoln Law*". Further, 18 U.S.C. §§§ 287 (Elements); 371 (Conspiracy to defraud the United States; Defrauding the Government of Money or Property and Obstructing or Impairing Legitimate Government Activity are under this Court's jurisdiction.

2. This Court has personal jurisdiction over the Plaintiff through geographic jurisdiction being less than 100-miles special jurisdiction and Defendants' breach of their U.S. Higher Education Act of 1965; its amendments and other laws disclosed in their respective *Program Participation Agreements*, (PPA) each defendant entered into with the *U.S. Department of Education* on their own volition.  Through their PPA's each received fraudulent payments from the government. Defendants received payments using Relator's Master Promissory Note, (MPN).  Relator's MPN was disclosed to pay for tuition using the HEA program to obtain loan(s) to fund education expenses. October 28, 2015, Relator learned the MPN was used deceptively to demand, collect and receive fraudulent unlawful payments from the Government and Relator contrary to the U.S. Higher Education Act of 1965, Title IV (HEA) and amendments to that law each defendant agreed to comply with as participants under the student loan federally insured programs.

## INTRODUCTION

1.      Plaintiff, the United States of America ("United States"), the Government brings this action to recover treble damages, civil penalties and costs under the False claims Act 31 U.S.C. §§ 3729-33 ("FCA"), and to recover damages and other monetary relief under the common law and equitable theories this court deems appropriate.

2.      Plaintiff, People of the State of Connecticut ("Connecticut") brings this action to recover treble damages, civil penalties and costs under the Connecticut False Claims Act (CFCA)[1] The Federal and state false claims act[2] statutes are similar statutes in many aspects.

3.      Plaintiff, People of the State of California ("California") brings this action to recover treble damages, civil penalties and costs under the California False Claim Act, Cal. Gov't Code §12650 et seq., and to recover damages and other monetary relief under the theory of unjust enrichment

4.      Plaintiff, the State of Florida ("Florida") brings this action to recover treble damages, civil penalties and costs under the Florida False Claims Act, Fla. Stat. § 68.082(2).

5.      Plaintiff, the State of New York ("New York") brings this action to recover treble damages, civil penalties and costs under the New York False Claims Act State Finance Law, Art. XIII 187 et seq.

## RELATOR'S DISCLOSURES

6.      October 28, 2015 Relator discovered defendants obtained alleged a student loans of over $79,000.00 were due and owing on Relator-borrower's Financial Aid Transcript, (FAT).  Exhibit 2.

---

[1] Conn. Gen. Stat. Ann. §§17b-3081 to 17b-301p
[2] 31 U.S.C. §§3729-3733, Federal False Claims Act.

7.      April 10, 2016, Relator received an Equifax national credit report.  That report alleged student loan debt of over $175,000.00 for the same loans reported on Relator's FAT was due and owing. Exhibit 4.

8.      Academic Institutions (AI) submitted eight student loan unauthorized certifications using Relator's MPN, identifying and other personal information to obtain Federal student loans under the HEA, Title IV; its amendments when Relator had withdrew, transferred or was otherwise expelled by AI's, Exhibit 2.  See Facts – Flowcharts and Narratives, pages 15 through 26; Exhibit 5, Navient's Admission against its own pecuniary, propriety and penal interests; it charged Relator for loans refunded February 4, 2009; ECMC harassed Relator and demanded repayment for unauthorized loans refunded to Navient on 2/4/2009 [Exhibit 10, pg. 43], ECMC defaulted the same loans [Exhibit 11, pg. 89], it employed the debt collection services of TransWorld Systems, Inc., to collect payments [Exhibit 11, pg.89]   and misrepresented its alleged debt to IRS and to the U.S. Treasury Department to offset Relator's 2014 federal tax refund and garnish Social Security Retirement income on four occasions for debt' that were unauthorized. Exhibit 3, pgs. 4, 5, 6, and 7.

9.  Lender-guarantor and servicers used unlawful unauthorized loan certifications submitted by AI's demanded the Government to pay money.  In violation of Relator's Federal Debt Collection Practices Act, the Enterprise demanded and did receive payments from Relator for loans not authorized..

10.      PPA's entered are enforce by the U.S. Department of Education.

11.      AI, Lenders and Servicers and their respective personnel participated the HEA. Relator provided identifying and characteristic information intended for Relator's educational purposes, not submit to extort unlawful debt totaling more than $175,000.00.  See Equifax Credit Report, Exhibit 4.

12.      Education experiences had starting 2003 through 2016 Relator has personal knowledge, evidence as documented in admissions against made by defendant's own pecuniary,

proprietary and penal interests that each defendant has individually, collectively in their personal and professional capacities engaged in conspiracy[3] to defraud the United States Government to receive payment for alleged borrower-Relator education loan debts that were procured by substantial misrepresented fraud; further, in one instance, AI's catalog, program description and its delivery was fraudulent, academic integrity cheating occurred as reported by faculty and Relator with on corrective action by the AI.

## AI'S ACADEMIC INTEGRITY – CHEATING ON EXAMS

13.     Catalogue published by academic institutions are used to describe program's core lecture and laboratory practicum courses, in this instance. University of Bridgeport College of Naturopathic Medicine, ("UBCNM") published its 2002-2004 Catalogue. Exhibit 6, pgs. 8 – 15. UB claimed would prepare students to obtain gainful employment in graduate level programs; however, what appeared to be status quo during 2003-2004 academic year, students were not prepared to obtain gainful employment with significant academic integrity cheating prevalent.  Scientific equipment did not exist to comply with NAACLS. Exhibit. 6, pgs. 1-7; and 32-38.

14.     Contrary to UBCNM's accreditation permit and authorizations obtained from New England Accreditation of School [Exhibit 6, pgs 32-33] and Universities and National Accreditation Association of Clinical Laboratory Sciences, Exhibit 6, pg. 34 while academic integrity issues were brought to the attention of academic boards by faculty impacted its accreditation's (a) permit, (b) authorization accreditations, (c) Program Integrity, et al.; UBCNM's Academic Board did nothing to prevent future events.

15.     UBCNM breached its PPA, accreditation agreements and deceived prospective and enrolled students and the public's trust.

---

[3] 18 U.S.C. § 371

MPN UNAUTHORIZED USE CAUSED IDENTITY THEFTS OF AI'S

16.     Relator's MPN remained effective for a 10-year period beginning 2003 till 2013.

17.     From 2003-2013 the effective period, Relator's MPN was use to certify loans without authorization from Relator; alternatively with authorization AI's submitted authorizations for more than Relator authorized.

18.     Failure of all five AI's to provide Relator with Exit Counseling chose to conceal the amount of loans it actually received, until Relator conducted an inquiry beginning March 6, 2015. Exhibit 10.

19.     AI defendants –Canadian College of Naturopathic Medicine, (CCNM), Pacific College of Oriental Medicine, (PCOM), Atlantic Institute of Oriental Medicine, (ATOM) and New York College of Naturopathic Medicine, (NYCHP) – all unlawfully used Relator's identifying information, characteristics to receive an MPN issued by the U.S. Department of Education.  Each used Relator's MPN to submit loan applications on multiple occasions to the Government between 2004-2009 without consent, approval or authorization; or during loan periods after which Relator had withdrew, transferred or was otherwise expelled by AI.  See Exhibit 2 and Complaint's *FACTS* Flowcharts and Narratives, pgs. 15-26

20.     Equifax national credit report received April 10, 2016, Relator discovered five different

defendants reported alleged education loan debt in 455 inaccurate, incorrect and duplicated entries. Exhibit 4, Equifax Credit Report Analysis.

21.     The 455 entries comprised of 37-pages of incorrect education loan debts. Exhibit 4. Of the 42-paged Equifax Credit report; the same 455 education loan entries are updated on March 16, 2016. However, Relator has disputed the education loans starting March 6, 2015 [Exhibit 11, pg. 1]; Enterprise defendants updated incorrect education loan information to make it appear accurate and

correct to reviewers of Relator-borrower's national credit report.  See Exhibit 4 – Education Loan
updated dates.

22.      March 2016, Relator requested Enterprise-defendants to validate the alleged student
loan debt.  Exhibit 3, pages 70-71.

23.      Navient replied April 13, 2016; it had within its records two returned NYCHP loans as
of February 4, 2009.  Exhibit 5.  To date neither Enterprise Navient nor ECMC validated the other
six loans disputed by Relator.  See *FACTS – Flowcharts and Narratives.*

24.      Navient's reply of April 13, 2016, provided loan certifications that appears to be for
ATOM.  Note, a subsidized amount written in was $8,500.00.  Exhibit 5, page 15.  On the same
document, an unsubsidized amount was written in for $18,500.00; further Ms. Ahmad claims:

> "It is important to remember that by signing the Promissory Notes, you indicated that you
> had agreed to the terms and conditions of the loans including repayment of the entire
> balance." Exhibit 5, page 1.

25.      Similarly, as fiduciaries, AI, Lenders and Servicers, specifically Navient; and their
officers are subject to the highest standard of care and diligence in administering the Title IV,
programs and in accounting to the Secretary *for the funds received.* 34 C.F.R. § 668.82(a),(b).
Navient breached its fiduciary duty for seven years from 2/4/2009 till 4/13/2016.  In other words, it
should not have taken more than a year of disputed correspondence about alleged student loan debt
to get Navient to search its records to find two of the eight disputed loans were in fact returned to
it more than seven years ago.

26.      Note, Exhibit 5 – page 10, 15 or 16 is not signed by Relator; interestingly, those pages
appear to be for several of the eight loans disputed; or the same loans Ms. Ahmad infers that
Relator *agreed to repay despite* not authorizing the loans for purposes intended, Relator's education.

27      Navient's internal controls are unreliable.  It has in its records information that
proved irregularities existed for the past seven years. Navient had records of returned unpaid

refunds since February 4, 2009. It has charged Relator for the same loans, caused derogatory information to be placed onto national credit reports; demanded insured payments for the same loans from the Government.

28.     Relator had suffered 13-years of the derogatory 455 false incorrect, inaccurate national credit report entries are from Navient, U.S. Department of Ed/PA, Sallie Mae, Student Assistance Foundation, and ECMC reported beginning 9/16/2003 [Exhibit 4, page 1 –Analysis of national credit report entries made by: entry #9 – 9/16/2003] through April 13, 2016, [Exhibit 5] and beyond. These same 455 entries are what neither debt collector could validate.

29.     Defendants were asked to validate and substantiate the alleged student loan education debts by Relator starting March 6, 2015 through March 2016. Exhibit 11, pg. 1; Exhibit 3, pg. 40-41. Dismissive of Relator's civil and Consumer Rights under the Fair Credit Reporting Act, Federal Debt Collection Practices Act, et. al. [Exhibits 10, pgs. 1 thru 181; instead of conducting an effective validation to determine the accuracy of the paper or electronic authorization vs. enrolled attendance that supposedly supported the education loan debt, Enterprise defendants updated information onto national credit reports with incorrect, inaccurate records in an unconscionable manner that misrepresented debt on March 16, 2016. Exhibit 4.

## WHISTLEBLOWER RETALIATION – SABINE OXLEY VIOLATIONS

30.     The Enterprise and Agencies made 455 entries onto national credit reports to collect an unlawful debt. Each knew or should have individually and collectively, personally and professionally but for their failure to conduct meaningful investigative validation, it would have known the entries are incorrect, inaccurate or otherwise unconscionably false as were the intentional unreasonable demands to extort payment from the Government for an unlawful due to their failure to scrutinize the paper or electronic documents before demanding repayment of loans prepared and submitted that were:

(1) False,

(2) Certifications for loan periods when borrower withdrew, transferred or was expelled,

(3) Used borrower's Master Promissory Note (MPN) between 2004-2013 without

authorization and when borrower had withdrew, transferred or was otherwise expelled by

the same AI's

(4) entered 455 false entries onto borrower's national credit reports with knowledge of

falsity, (5) Enterprises has weak internal controls in violation of Sabine Oxley Act, (SOX);

each failed to capture, report and disclose information that can be relied upon; and reported

willfully false information during federal government investigation on March 16, 2016

alleging the 455 entries were correct; Navient failed to disclose it on February 4, 2009

received two returned refunds and ECMC demanded collection of the same two return loans

and place the same into default.

(6) ECMC made material misrepresentations to federal executive agency investigating

disputed student loan debt, e.g., U.S. Department of Education, Inspector General's Office;

Consumer Financial Protection Bureau (CFPB), the U.S. Treasury Department and the

Internal Revenue Service to garnish and offset borrower's income and refund based on

known false alleged non-tax debt by taking 2014 federal tax refund violating 18 U.S.C. 1001, 18

U.S.C 371 and

(7) used the U.S. Postal Mails and wire to extort or otherwise demand payment from DOE

and borrower by making false reported entries and claims on Relator's Financial Aid

Transcript (FAT) education loan debt of $79,808.00 and national credit reports for more

than $175,000.00 of unauthorized student loan certifications submitted by AI's.

31.        Further education student loan alleged debt due was not simply incorrect,

inaccurate; it was also made incorrect, inaccurate since it is duplicated by the five different debt

collectors.

32.    Enterprise and Agencies had due diligence requirements to know what they are attempting collect.  To support the basis of their collection through validation of the debt upon Relator's requests as occurred on March 6, 2015. Exhibit 11, page 1.

B.    **PPA's Scope and Independent Contractor's Compliance**

33.    DOE's PPA's scope of coverage enforced under PPAs' hold participants responsible and accountable for compliance with signed PPAs which includes education laws in pertinent part:

> Federal Pell Grant Program 20 U.S.C. 1070(a), et seq., 34 CFR Part 690
> Federal Family Education Loan Program, 20 U.S.C. 1071, et seq., 34 CFR Part 685
> Federal Direct Student Loan Program 20 U.S.C. 1087a, et seq., 34 CFR 674
> Federal Perkins Loan Program 20 U.S.C. 1087aa, et seq., 34 CFR Part 674
> Federal Supplemental Educational Opportunity Grant Program, 20 U.S.C. 1070b, et seq.; 34 CFR 676

34.    Starting 2003 through 2008, Relator attended five different academic institutions over that period, as follows:

> University of Bridgeport, College of Naturopathic Medicine, (UBCNPM) 9/03-6/04
> Canadian College of Naturopathic Medicine, (CCNM) 1/05 – 5/05
> Atlantic Institute of Oriental Medicine, (ATOM) 5/06 – 4/07
> Pacific College of Oriental Medicine, (PCOM) 4/07 – 7/07
> New York College of Health Professions (NYCHP) 1/08 – 10/08

C.    **Systemic Compliance Failures – Exit Counseling**

35.    Relator transferred to and from the five listed AIs'; at the time of transfer, withdrawal or expulsion, not one of the AI's provided an Exit Counseling session through the available means of in—person, by post or electronically as required by 34 CFR 682.604.[4]

---

[4] § 682.604 Required exit counseling for borrowers.
(a) *Exit counseling.*
(1) A school must ensure that exit counseling is conducted with each Stafford Loan borrower and graduate or professional student PLUS Loan borrower either in person, by audiovisual presentation, or by interactive electronic means. In each case, the school must ensure that this counseling is conducted shortly before the student borrower ceases at least half-time study at the school, and that an individual with expertise in the title IV programs is reasonably available shortly after the counseling to answer the student borrower's questions. As an alternative, in the case of a student borrower enrolled in a correspondence program or a study-abroad program that the home institution approves for credit, written counseling materials may be provided by mail within 30 days after the student borrower completes the program. If a student borrower withdraws from school without the

D.   **Master Promissory Notes: A Promise To Repay; Implied Authorization**

36.   Relator signed Master Promissory Notes, (MPN) *in advance of receipt of education loan funds* to obtain federally insured student loans to pay for the cost of attending the five named AI's.  MPN's signed promise to repay belies proper authorization of loans. It is incorrectly stated and does not support repayment for unauthorized loan certifications sent and paid to AI's without authorization, consent or approval.  Without evidence provided what an individual AI received or an Exit Counseling session provided to borrowers, then  borrowers are left to their own devises to learn after the fact the amount of loan(s) an AI actually received by unlawfully borrower identity thefts.  For instance,

    a.   At no time did any of the five AI's provide Relator with a receipt to show the funds it received to cover cost of tuition to attend or provide an Exit Counseling session required by their individual PPA's,

    b.   At various times and dates after withdraw, transfer or expulsion, Relator entered into various repayment methods with the last being an Income Base Repayment arrangement February 2015, with Enterprise-Navient, servicer.

    c.   Relator's last loan repayment was March 31, 2015.  When the ability to repay was not available Relator entered into deferred, forbearance and rehabilitated allegedly defaulted loans; now, it is questioned whether repayments were for legitimate education loans authorized by Relator-borrower.

    d.   Relator's April 2015 personal Federal tax return was filed; the same 2014 Federal refund was confiscated. Subsequently Social Security Administration

---

school's prior knowledge or fails to complete an exit counseling session as required, the school must, within 30 days after learning that the student borrower has withdrawn from school or failed to complete the exit counseling as required, ensure that exit counseling is provided through interactive electronic means, by mailing written counseling materials to the student borrower at the student borrower's last known address, or by sending written counseling materials to an email address provided by the student borrower that is not an email address associated with the school sending the counseling materials.

retirement income was also garnished for loans she did not authorize, for
example.

e.   March 2015 thru June 2, 2015, Relator began inquiries into alleged loan
numbers, amount of debt to repay and dates of alleged attendance.

f.   Relator discovered after the fact that the Enterprise-ECMC took Relator's
Federal tax refund for 2014 and garnished Relator's Social Security
Administration retirement income without advance Notice given to Relator.

g.   Navient hired Allied Interstate, LLC to collect repayment of loans [Exhibit 11,
pg. 119 - 121] ECMC hired TransWorld Systems, Inc., to collect payments for
NYCHP, [Exhibit 11, 89 et al] ECMC demanded rehabilitation payments from
Relator an earlier default of NYCHP loans.  [Exhibit3, pg. 57]; ECMC received
payments directly from Relator for loans not authorized.   Subsequently
when Relator's written communication demanded the collection efforts stop,
ECMC hired TransWorld Systems, LLC and stopped its collect, however,
harassment continued ultimately with Account Control Technologies, Inc.; to
collect repayments [Exhibit 10, pg. 180-181] when it was directed by CFPB to
stop collection efforts pending resolution of the disputed alleged loan debts.

1.   The Enterprise and their Agencies made material misrepresentations to the
Consumer Financial Protection Bureau (CFPB), U.S. Department of
Education' Office of the Inspector General, (DOE-IG) both of whom
conducted an executive agency investigation into Relator disputes over DOE
paid federally insured education loan debt allegedly due and owing by
Relator.  Part of the truth came out on April 13, 2016, after CFPB's
investigations were closed.  Exhibit 5; Exhibit 3, pg. 29.

j.  Obfuscations[5] of the duty of debt collectors to validate debt asserted by AI's, lenders and Servicer as requested by Relator; then to put in writing directing Relator to '*contact schools if further investigation or inquiry regarding the alleged student loan debts were disputed*' [Exhibit 5, pg. 2 1ˢᵗ full ¶] is unconscionable and violation of PPA Due Diligence with Financial Management of education loans [Exhibit 5- , Page 2, first full paragraph *Navient – April 13, 2016 – Michele Ahmad-Office of the customer Advocate-Navient Department of Education Loan Servicing*] and violates Relator's Fair Credit and Debt Collection Rights under law.

37.    As a debt collector, '*Enterprise*'; as well as their respective personnel named in the Exhibits and named in the Caption, they are duty bound to know what, why and the basis for debts they legitimately have a legal right to collect.

38.    Relator's rights under the Fair Credit Reporting and Federal Debt Collection Practices Act by the named Credit Reporting Agencies; Enterprise; their employees who engaged in *conspiracies to collect unlawful debts* by use of the U.S. Postal Mails in civil violation of Racketeering Influence Corrupt Organizations Act, (RICO) – mail, wire and extortion; and Sabine Oxley Act (SOX), due to internal control failures and retaliation against Relator whistleblower for complaining to the:

U.S. Department of Education Office of Inspector General,

Federal Trade Commission

Consumer Financial Protection Bureau and

The Internal Revenue Service /U.S. Treasury Department

---

[5] Obfuscate – to make obscure or unclear.

39.     Enterprise and Agencies made material false statements in violation of 18 U.S.C. 1001, in multiple administrative federal government investigations during 2015-2016 to justify its garnishment, offset of federal tax refund and to get payments on federally insured student loans.

40.     Additionally, Relator disputed at various points education loan debts, race discrimination and civil rights treatment, e.g., November 2008 – *Nassau County Human Relations Commission* Exhibit 11 – pages 32-88 and DOE's *Emil Milosz, Senior Financial Analyst*, U.S. Dept. of Ed, Federal Student Aid, School Eligibility Channel, Program Compliance, School Participation Team-Northeast *wire emailed communications*, Rm. 71B4, 7th Fl. Union Center Plaza 830 First Street, N.W., Washington D.C. 20002 – Exhibit 7 – six (6) pages;  default; and engaged in rehabilitation of allegedly defaulted student loans debt owed.

## RACIAL DISCRIMINATION IN EDUCATION; EXPELLED FOR BEING '*IMPOLITE*'

41.     Further, 2008-2009 Relator was treated in a racially discriminatory manner in at NYCHP.  At that AI, Relator experienced substantial material misrepresentations regarding the academic programs, its delivery, the catalogue description of the program content and the oral statements about available federal insured student loan to cover cost of attendance from NYCHP's personnel; as well as, substantial misrepresentations made at the time of admission discuss, to enrollment, attendance to expulsion.

42.     Specifically, NYCHP agreed to accept 67-transfer credits at admission discussions; after acceptance, enrollment and two semesters later it accepted 55-transferred credits.  The shortened 12-transferred credits were then the subject of improper registration advisement to repeat the 12-credits at NYCHP.

44.     U.S. Department of Education, Office of Civil Rights, (OCR) enforces several Federal civil rights laws that prohibit discrimination in programs or activities that receive Federal funds

from the Department of Education. These laws prohibit discrimination on the basis of race, color, and national origin, sex, disability, and on the basis of age. These laws extend to all state education agencies, elementary and secondary school systems, colleges and universities, vocational schools, proprietary schools, state vocational rehabilitation agencies, libraries, and museums that receive U.S. Department of Education funds.

45.     NYCHP received federal government money for Relator to finance education.

46.     Title 34 CFR § 100(vi) 'deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program (including the opportunity to participate in the program as an employee but only to the extent set forth in paragraph (c) of this section)'.

47.     NYCHP expelled Relator November 3, 2008, over transfer of credit as agreed.  See FACTS, Flowchart and Narrative #5.

48.     November 2, 2008, Relator brought the expulsion to the attention of NYCHP board of Directors, Exhibit 11, pg.54; Nassau County Human Rights Commission, (NCHRC) on November 17, 2008; Exhibit 11, pg. 96 – 103 and to the U.S. Department of Education's Mr. Emil Milosz, Senior Financial Analyst on or about February 9, 2009. Exhibit 7.  While an investigation was conducted; no hearing was held or a resolution reached to the best of Relator's knowledge who did not return to NYCHP for alleged racial discrimination in education.  The Facts and evidence are:

a.     NCHRC and DOE were aware of the alleged discrimination.

b.     Despite that knowledge on 12/26/2008, DOE disbursed loans to NYCHP and

c.     While repaid, NYCHP knew or should have known Relator no longer attended that institution; it was well after 30-days of its receipt, e.g., 12/26/2008 – 2/4/2009 in violation of its PPA terms and conditions and for Enterprise – debt collectors to assert claims to collect unauthorized

loans and not know are specious unreasonable facts given their knowledge of the true events and facts.

49.     The FAT also collectively for all five identified AI's loan periods and *the alleged enrolled attendance dates* under the U.S. Higher Education Act of 1965, Title IV, HEA for student loans:

>    New York College of Health Professions, NYCHP- 1/2/08–4/20/09
>    Pacific College of Oriental Medicine, PCOM - 4/20/07–12/14/07
>    Atlantic Institute of Oriental Medicine, ATOM - 5/2/06–4/15/07
>    Canadian College of Naturopathic Medicine, CCNM -1/3/05–8/19/05
>    University of Bridgeport College of Naturopathic Medicine, UB-8/1/03-4/1/04

50.     However, Relator did not attend the above AIs during the material alleged loan period's enrollment dates shown below when loan disbursements were made and not returned as unpaid refunds:

>    NYCHP 10/2008 -4/20/2009;   PCOM 7/2007-12/14/2007;
>    ATOM 1/2007 – 4/15/2007    CCNM 5/05-4/1/2004

51.     NYCHP submitted certifications through their access to the National Student Loan Data System, (NSLDS) as the FAT discloses. NYCHP received disbursement for three loans Relator did not authorize.

| Table A | | | | |
|---|---|---|---|---|
| NYCHP UNAUTHORIZED STUDENT LOANS Exhibit 2 | | | | |
| Loan # | Guaranteed Amount | Last Disbursement | Outstanding principal balance | Disputed |
| 1 | $8,500.00 | $4,250.00 | $5,549.00 | NYCHP expelled Relator 11/2008; since then Relator did not attend from 10/2008-4/20/2009 when DOE paid funded certification on 12/26/08 was disbursed to NYCHP. DOE knew of expulsion Exhibit 7. |
| 2 | $12,000.00 | $,6,000.00 | $7,533.00 | NYCHP expelled Relator 11/2008; since then Relator did not attend from 10/2008-4/20/2009 when DOE paid funded certification on 12/26/08 was disbursed to NYCHP.  DOE knew of expulsion Exhibit 7. |
| 3 | $8,500.00 | $5,500.00 | $7,528.00 | Relator authorized $4,500.00 Exhibit 11, pg.37 |
| 4 | $12,000.00 | $5,000.00 | $8,008.00 | Relator authorized $4,500.00. Exhibit 11, pg. 37 |

52.     NYCHP used Relator's identity and characteristics to submit student loan certifications between 10/2008-4/20/2009 to the DOE.  Till April 13, 2016, Navient/ECMC alleges wrongfully that Relator owes those debts.  According to the FAT as of October 28, 2015, it alleged that $28,618.00 was due [Exhibit 2, pg. 2]; TransWorld Systems, LLC alleged the total loan debt allegedly due to NYCHP was $37,469.46 as of September 6, 2015. [Exhibit 10, pgs. 103] and the national credit report as of April 10, 2016 alleged that for the same loans $29,818.00 is due. Exhibit 4.

## WEAK INTERNAL CONTROLS, UNAUTHORIZED DEBT CLAIMS ARE MALICIOUS

53.     Navient on April 13, 2016, alleged that it received repaid loans on February 4, 2009 from NYCHP. Exhibit 5, page 2, full first paragraph.

54.     March 6, 2015 through March 2016, Relator disputed the amount and number of student loans directly to Navient and ECMC.  It received more than 132 pages of written evidence of *not attending NYCHP*, among the correspondence.   October 30, 2015, Relator submitted Education Loan Discharge request for False Certifications [Exhibit 11, pgs. 115-118] which Navient denied without conducting a reasonable inquiry, validation of alleged debt or produced evidence that supported the collection of an alleged debt due NYCHP until six months later when it had the evidence on or about February 4, 2009.

55.     Navient charged, Relator with the wrongful and unlawful debt.

56.     Navient demanded repayment for the unlawful debt and received payment on March 31, 2015 from Relator.

57.     Navient knew on February 4, 2009, that NYCHP refunded the principal of $4,250.00 and $6,000.00.

58.      Navient since February 2, 2009 till October 28, 2015 receipt of the FAT the principal and interest for the $4,250.00 was $5,549.00.

59.      Navient's April 13, 2016 correspondence makes no mention of the $1,299.00 in interest it assessed Relator on the repayment of the unlawful debt.

60.      Navient since February 4, 2009 till April 10, 2016 receipt of the Equifax national credit report, its April 13, 2016 correspondence, however, it makes no mention of the $2,039.00 interest for the entry shown on Relator's National Credit Report.

# FACTS

Intent to be clear and concise, the ***Facts*** section of this Complaint consists of Flowcharts. Each Flowchart illustrates the *Facts* as supported as numbered by demonstrative evidence via Exhibits as referenced.  Each Flowchart is accompanied with a numbered narrative to guide with sections that supports factual allegations. The filed initially under seal the same Flowcharts and narrative are intended to serve as reference, review and re-review pages.

Flowcharts aid in navigation of facts, timelines, evidence and exhibits to support elements of claims, particularly fraud with specificity.  Each flowchart is used to unfold the elements that supports the False Claims Act violations for payments wrongfully received from the Government for tuition when Relator had withdrew, transferred or was expelled by AI.

Further claims of false unauthorized certifications, non-compliance to return of unpaid refunds obtained unlawfully and not used for Relator's education during specific loan periods are fraudulent student loan guaranteed amounts and disbursements made to AI's named herein. The unlawful unconscionable efforts made by defendants to collect fraudulent alleged debts asserted support grounds to discharge loans, terminate PPA and to make U.S. Department of Education, states and Relator whole.

FLOWCHART 1

UBCNM ACCREDITATION & PROGRAM INTEGRITY OF VIOLATIONS OF PPA'S, 2002-2004
CATALOG SUBSTANTIAL MISREPRESENTATION, ACACEMIC INTEGRITY (CHEATING) AND BREACH
OF PUBLIC TRUST FOR FAILURE TO DISCLOSE TRUE SUCCESS OF STUDENTS



## FLOWCHART 1 – NARRATIVE

(1)  Academic catalogue's introduce prospective students to course and program offerings available. Acceptance, enrollment and payment of tuition for the described program is what student expects to be delivered.  Students chose various higher education universities in part based on its Accreditation(s). Accreditation rigors describe programs, obtain authorization by state professionals knowledgeable of the depth and breadth of higher education programs offerings; they dictate which can and cannot operate within the state.  State based agreements entered into among high degree of self-assessment and public trust are relied upon by prospective students, accreditation organizations and the public's trust that what is described in a catalogue is actually delivered to students.  Connecticut's New England Accreditation of Schools and Universities (NEASU) and National Accreditation Association of Clinical Laboratory Sciences, (NAACLS) accredited UB.  Exhibit 6, pgs. 32-34) as UB claims.  Receipt of federally insured student loans, UB entered into a PPA with the DOE.  DOE requires full compliance with the U.S. Higher Education Act of 1965 Title IV and its amendments.  UB claimed that NAACLS accredits its laboratory facilities; *however*, it appears that NAACLS' website search of UB's accreditation, it responded with, 'No Records" for UB's alleged accreditation.  Exhibit 7, pg. 34.

(2)  Relator relied on UB's accreditation and its 2002-2004 catalogue to be truthful as published and as a guide to assist with making an informed decision about an educational choice to attend UB.  UB misled Relator, its accreditation bodies, the Government and breached the public's trust.

### A.  NO BASIC SCIENCE LABORATORY EQUIPMENT; UB CHARGED TUITION FOR LABORATORY

(3)  Basic Sciences – UB's Catalogue advertised core lecture and laboratory clinical practicum. Exhibit 6, pgs. 8 – 13.

(4)  Core lectures for histology, physiology, biochemistry and Anatomy are described, Exhibit 6, pgs 12-13.

(5)  Consistent with NAACLS, 'No Results'; UBCNM did not have laboratory facilities equipped to deliver or teach, '*appropriate methods of laboratory and clinical diagnosis*.'  Exhibit 6, pg. 9 third column – Naturopathic Practice; last sentence.

### B.  ACADEMIC INTEGRITY – CHEATING ON EMBRYOLOGY AND ANATOMY EXAMS

(6)  Relator experienced academic integrity cheating in Embryology I, II taught by Professor Christopher Bennett during academic year 2003–2004.  Exhibit 6, pgs. 1 – 7; pgs. 15-30-Bennetts CV.

Professor Bennett recalled a different academic integrity cheating episode during his tenure of 1999 thru 2004 at UB.  He reported that incident, He recalled nothing happened to stop future events.

(7)  Relator bought to the attention of the Academic Board (a) an Anatomy 1 cheating event.

(8)  Professor Bennett who taught the Embryology courses, did not report that event because an earlier incident brought to UB's administration attention, it did not do anything to stop future events.

(9) Relator bought a second cheating event to its attention Professor Gaulton.  He taught Anatomy 1; at

the break he gave students 100-questions to study for the upcoming examination. Of the 100-questions, it appeared that 75 were used on Anatomy exams. Brought to the attention of the Academic Board, nothing happened to stop future events to the best of Relator's knowledge.

(10) Professor Bennett resigned.

(11) Relator withdrew from UBCNM.

(12) Relator was defrauded by UB. Relator assert defenses to repay based upon the frauds with UB's catalogue, CNM's academic cheating and no benefit received from the education, transferred to CCNM. Exhibit 1, pg.4 – CCNM Transcript.

**FLOWCHART 2 – CANADIAN COLLEGE OF NATUROPATHIC MEDICINE CONFIRMS ATTENDANCE AND TUITION PAID JUNE 2016 NOT VALIDATED BY NAVIENT WHO DEMANDS REPAYMENT OF UNPAID REFUND THAT PPA REQUIRED BE RETURNED**



June 1-2, 2016 Laura Sun, Financial Aid personnel for Canadian College of Naturopathic Medicine confirmed Winter 2005 attendance and tuition paid by Relator. Exhibit 8, pgs-1 thru 6

Relator attended Winter 2005 semester 1/3/2005-5/6/2005.  Exhibit 8, pg. 1

Laura Sun on June 2, 2016 confirmed tuition was in Canadian dollars, or $7,891.00 Exhibit 8, pg. 3.

January 2005 US/Canada monetary conversion rate was 1:1.307; $1.307/ $7,891= $6,037.00 USD.  Loan period of 1/2005-12/2006, [Exhibit 2, pg. 3], paid by Student Assistance Foundation; now, Navient was for a total of $18,500 or converted to USD is $24,179.50 minus $6,037= $18,142.50 or the amount due as a return unpaid refund, not returned.

CCNM was required to return unpaid refund because Relator did not attend after 5/6/05.  CCNM breached its PPA with the Government.  Navient [Exhibit 2, pg. 3] and ECMC [Exhibit 10, pg. 43] violated its PPA due diligence and fiduciary duty owed Government, violated Relator's Consumer Credit rights and Federal Fair Debt Collection Practices Act when it had a duty to validate debts it collected, not tell Relator to contact schools, Exhibit 5, page 2 1st ¶ last sentence and Civil RICO for mail, wire and extorted payment of an unlawful debt from Government, collected an unlawful debt from Relator and taxpayers.

CCNM did not provide Relator with an Exit Counseling session.

## FLOWCHART 2 – CCNM NARRATIVE

(1) June 1 – 2, 2016 Relator confirmed with Laura Sun, Financial Aid representative of CCNM the following:

(2) Winter 2005 semester began January 3, 2015 and ended May 6, 2005 – Exhibit 8, pg. 1.

(3) Tuition for Winter 2005 semester paid was $7,891.00 in Canadian dollars.

(4) FAT [Exhibit 2 loans 9 and 10] were guaranteed to CCNM for $8,500 and $10,000 Respectively for a total of $18,500.

(5) Currency conversion for January 2005 for USD;CND was $1: $1.307.  Total loan of $18,500 x $1.307 = $24,179.50.  Converted $7,891.00 from CND to US is $6,039.00. Subtracted from $24,179.50 - $6,039.00 = $18,142.50 of Return unpaid refund CCNM should have returned within 30-days of its notice Relator was not attending.

(6) CCNM loan period was from 1/3/2005 – 8/5/2005.   CCNM's PPA required it to return unpaid refund after 5/6/2015 for $18,142.50.  It did not.

(7) Relator did not receive an Exit Counseling from CCNM.

FLOWCHART 3 – ATOM

FAT guaranteed amounts for loan #7 for $10,543.00 and #8 for $12,333.00 for a total principal of 22,876.00, Exhibit 2 pg. 2.   (1)

Equifax credit report received 4/10/16 [Exhibit 4, pgs. 1, 3, Accts. 0032. 0122 and 0132] reported Principal & Interest for Loan #7 of $22,719.00 and #8, of $25,181.00 for a total of $47,900.00 alleged debt   (2)

ATOM's Financial Aid Officer confirmed 2005 tuition was $11,000; 2006 was $12,000.  Exhibit 1, pg. 9.   (3)

Relator attended ATOM from 5/2005-4/2006 a full academic year. Loan # 8 was disbursed 1/4/2007. Relator did not attend the full year for 2007.

ATOM received loan #8 on 1/4/2007 for a disbursed amount of $12,333.00. Exhibit 2, pg. 2.  Relator attended one semester of the three semesters per academic year. Two-thirds (2/3) of the loan should have been refunded.  It is estimated that $8,222.00 was not used by Relator and was not returned by ATOM.   (4)

Relator was not provided an Exit Counseling session from ATOM; Relator learned of the $12,333.00 loan #8 on 10/28/2015, receipt of the FAT [Exhibit 2].   (5)

## FLOWCHART 3 ATOM NARRATIVE

(1) FAT received October 28, 2015 reported two loans issued to ATOM. The Guaranteed Amount #7 for $10,543.00 and #8 for $12,333.00 for a total principal of 22,876.00 Exhibit 2 see loans # 7 and 8.    Exhibit 2. pg. 2.

(2) Relator attended ATOM from 5/2005-4/2006 a full academic year. Loan # 8 was disbursed 1/4/2007; Relator did not attend the full 2007 academic year. Of the loan disbursed, 2/3 was not used for Relator's education purposes. Exhibit 1., pg. 2.

(3) ATOM received loan #8 on 1/4/2007 for a disbursed amount of $12,333.00. Relator attended one semester of the three semesters. For Loan #8, two-thirds $(2/3^{rd})$ of the loan should have been refunded.

(4) It is estimated that $8,222.00 was not used by Relator and was not returned by ATOM to lender according to tuition and semester tuition costs confirmed by Financial Aid Officer on June 16, 2016. Exhibit 1, pg. 9.

(5) Relator was not provided with an Exit Counseling session to learn of the loans ATOM received.

FLOWCHART 4 – PCOM[6]



FAT reported Loans #5 and 6 were guaranteed for $8,500 and $10,000 with disbursed amounts of $4,250 and $5,000 for a total of $9,250 using Relator's MPN provided using identifying characteristics and information for loan period 4/30-12/14/07, Exhibit 2          (1)

Tuition for, Spring 2007 semester paid was $2,878.00. Exhibit 1, pg. 7.          (2)

PCOM's Financial Aid Officer Gerri Hatten alleged it refunded loan #6 to lender.  Exhibit 13 -- spring of emails between Relator and PCOM's Ms. Hatten.          (3)

Loan #5 was for $4,250; tuition paid was $2,878.00 for a $1,372 difference. Exhibit 1, pg. 7.          (4)

Navient' received PCOM's Return of Unpaid Refund allegedly, however, the FAT shows Relator charged principal and interest for the Loan #6 refunded; Exhibit 2, pg. 2; neither mentions what happened with the $1,372.00 difference. Excess Cal Grant funds not returned to the Commission is a common violation. ECMC demands repayment for PCOM's returned refund for loans #5 and 6. Exhibit 10, pg. 43.          (5)

PCOM did not provide Relator with an Exit Counseling session.          (6)

---

[6] Source: http://www.csac.ca.gov/doc.asp?id=180 –Common Review Findings:  Excess Cal Grant funds not returned to the Commission.

## FLOWCHART 4 – PCOM NARRATIVE

(1) PCOM for Loans #5 and 6 received $9,250.00.

(2) Tuition paid to PCOM by Relator was $2,878.00 to attend Spring, 2007 semester.

(3) PCOM's then Financial Aid Officer alleges the loan was refunded.

(4) Relator disputed Return Unpaid Refund disputed education loan debt, including the difference for loan #5 was not discussed or disclosed by PCOM, Navient or ECMC.

(5) Navient denied Relator's Unpaid Refund discharged alleged it was not alternatively, its position was no refund was due without a thorough investigation. Despite PCOM did not provide Relator with an Exit Counseling session.

## FLOWCHART 5 – NYCHP

| Fiduciary duty standard 34 CFR§668.22: |
| --- |
| The governing regulation requires that a properly calculated return of Title IV funds be performed when a student . . . , or *fails to complete a payment period* or *period of enrollment*. See Exhibits 11, pages 84 and 26-31 Apkinar and Haffner letters.   (1) |

| Relator After Admission Expected | NYCHP Misled, Decided Otherwise |
| --- | --- |
| Sixty-seven credits transferred | Fifty-five credits were transferred |
| Official transcript despite loans # 3 & 4 it received $5,000.00 and $5,500.00 | Issued only unofficial transcript despite tuition was paid |
| Properly advised, not get tricked to retake 12-credits NYCHP told Relator it would accept as transfer credits | Suspended then expelled within three weeks of Fall 2008 semester 11/2008.                   (2) |

> On FAT for Fall 2008, NYCHP received student loan Guaranteed Amount for loans 1 and 2, $8,500 and $12,000; disbursed amounts of $4,250 and $6,000.00 respectively; it totals $10,250 with loan periods of 9/2/08-4/20/09; however, *NYCHP did not perform Exit Counseling with Relator and  did not attend NYCHP after 10/08.*
> Relator attended three-weeks of Fall 2008 before expulsion on 11/13/2008 by NYCHP. It did not refund the remaining *'period of enrollment;'* of 12 to 15 weeks of attendance required to complete that semester, it should have returned funded the balance to lender within 30-days after it expelled Relator on 11/13/2008. Exhibits-NYCHP Apknar & Haffner letters. Loans # 3 and 4 are part of unauthorized debt of $13,636 on credit report of 4/10/2016 and $13,127 shown on FAT of 10/15 NYCHP knew or should have known was a fraudulent certification paid by the government.   (3)

| NYCHP loan's 1 thru 4 principal and interest totals – Exhibit 2, pg. 2 (4) | | | |
| --- | --- | --- | --- |
| Loan # | Collector (Credit Report) | Navient/DOE-PA | ECMC |
| 1 | $8,039.00 | $5,594.00 | |
| 2 | $5,597.00 | $7,533.00 | |
| 3 | $7,662.00 | $7,528.00 | |
| 4 | $8,620.00 | $8,008.00 | |
| Totals | 4/10/16 Credit Report $29,818.00 Exhibit 4 | FAT - $23,664.00* | $37,469.46** |

## Notes

* FAT received 10/28/15 [Exhibit 2, Page 2] vs. ECMC-TransWorld Systems, Inc., dated 9/6/15, [Exhibit 10-, pages 106-108; a mere 32-days later it's $13,805.46 increase over FAT's amount for the same 4 loans. Equifax credit report dated 4/10/16 (Exhibit 4, pages 6, 7, 13 and 150) and is $6,200.00 increase over debt than FAT. All repayments includes loans 1 and 2, both are unauthorized certifications submitted after Relator was expelled by NYCHP; [Exhibit 2-FAT, 4-Equifax] and after material misrepresentation of Navient who subsequently discovered two loans that were refunded to it by NYCHP on February 4, 2009. Exhibit 5, pg. 2. Also, these are the loans ECMC defaulted, without advance notice to Relator.  These are the same loans it made material misrepresentations to U.S.  Treasury Department to garnish Relator's SSA retirement income and to IRS to offset an alleged non-tax debt to take Relator's 2014 federal tax refund and Navient alleged Loan # 1 and 2 were refunded to it on February 4, 2009; seven years earlier it failed to disclose and record their refunded status. Exhibit 5.

**TransWorld Systems, LLC's demanded $37,469.46, but ACT demands $37,534.34 on 3/14/16 for the same 4 loans (Exhibit 11, pages 89-91).

## FLOWCHART – NYCHP NARRATIVE

(1) NYCHP violated its PPA duty to the Government.

(2) NYCHP defrauded Relator.

(3) NYCHP knew it had expelled Relator 11/2008 before it submitted certification that were unauthorized on 12/26/2008.

(4) Navient and ECMC reported on national credit reports, FAT and defaulted loans Relator did not authorize.

# SUMMARY OF FLOWCHARTED ILLUSTRATION – A
## AI's FALSE CERTIFICATIONS

| Fiduciary duty standard 34 CFR§668.22: | | | | |
|---|---|---|---|---|
| The governing regulation requires that a properly calculated return of Title IV funds must occur when a student withdraws, drops out, is expelled or otherwise fails to complete a payment period or period of enrollment. Exhibits 1, AI transcripts/billing and 2-FAT for attendance dates. | | | | |
| **Dates enrolled** | **CCNM**<br>1/05-5/05 | **ATOM**<br>5/06-12/06 | **PCOM**<br>4/07-7/07 | **NYCHP**<br>1/08-10/08 |

| DATES RELATOR WAS *NOT* ENROLLED DURING *LOAN PERIOD* | | | |
|---|---|---|---|
| **CCNM**<br>5/05-12/15/05<br>Withdrew | **ATOM**<br>4/2007-1/4/07<br>Withdrew | **PCOM**<br>8/07-12/14/07<br>Withdrew | **NYCHP**<br>10/08-4/20/09<br>*Expelled* |

| Certifications Guaranteed Amounts, Disbursed to AI's After Relator had Withdrawn or was Expelled | | | | |
|---|---|---|---|---|
| **SCHOOL** | **CCNM** | **ATOM** | **PCOM** | **NYCHP** |
| Guaranteed amt. | $10,000 & $8,500 | $18,500.00*** | $10,000.00 | $8,500 &$12,000 |
| Not enrolled Loan Period | 5/05-8/19/05 | 5/2/06-4/17/07 | 9/07-12/14/07 | 9/2/08-4/20/09 |
| Full Loan Period | 1/2005-8/2005 | 5/2006-4/2007 | 4/2007-12/2007 | 1/08-4/20/09 |
| Tuition (USD) | $6,039.00* | $12,000.00 | $2,878.00 | Expelled, not enrolled |
| Unpaid refunds | $18,142.50** | $8,222.00 | $7,122.00 | $20,500.00 |
| Credit Report**** | $23,855.00 | $47,900.00 | $15,049 | $21,887.39 |

****FAT total of *unpaid refund* and *unauthorized certifications* AIs' got and held unauthorized payments totaling **an estimated** $53,986.50 principal and interest according to Equifax credit report Relator's debt is $108,691.39 for unlawful collection of funds from Government and amount Enterprise/Agencies want to collect from Relator.

NOTES* Winter semester '05' tuition was $7891.00 CND [Exhibit 5-CCNM Tuition] paid. Currency converted for 1/05 was $1 USD-:-$1.307 CND or $6,037.00 USD. CCNM received $18,500 USD, it totaled $24,179.50; deduct $6,039.00 = $18,142.50 for returned unpaid refund that CCNM did not refund.

*** Relator's ATOM tuition did not authorize $18,500, did not receive $18,500. AlliedInterstate/EMCM/Navient gave CFPB evidence, it shows $8,500.00 authorized loan amount.  That amount was crossed out, initialed by another without notice to Relator. (Exhibit 3-CFPB –Federal Investigation, pages-57; Exhibit -1 Academic Transcripts, pages4;  Exhibit 1- ATOM-transcript, pages 1-3;  6/2/16 Emailed Confirmations of tuition was $12,000.00 for 2005-2006 academic year, Exhibit 1 – PCOM, Billing Statement, pg. 7; Exhibit – 2 FAT, pgs. 2-3.

FLOWCHARTED ILLUSTRATION –1
20 U.S. Code § 1080 –
Default of Student Under Federal Loan Insurance Program[7]

[7] (a)NOTICE TO SECRETARY AND PAYMENT OF LOSS
Upon default by the student borrower on any loan covered by Federal loan insurance pursuant to this part, and prior to the commencement of suit or other enforcement proceedings upon security for that loan, the insurance beneficiary shall promptly notify the Secretary, and the Secretary shall if requested (at that time or after further collection efforts) by the beneficiary, or may on the Secretary's own motion, if the insurance is still in effect, pay to the beneficiary the amount of the loss sustained by the insured upon that loan as soon as that amount has been determined. The "amount of the loss" on any loan shall, for the purposes of this subsection and subsection (b) of this section, be deemed to be an amount equal to the unpaid balance of the principal amount and accrued interest, including interest accruing from the date of submission of a valid default claim (as determined by the Secretary) to the date on which payment is authorized by the Secretary, reduced to the extent required by section 1075(b) of this title. Such beneficiary shall be required to meet the standards of due diligence in the collection of the loan and shall be required to submit proof that the institution was contacted and other reasonable attempts were made to locate the borrower (when the location of the borrower is unknown) and proof that contact was made with the borrower (when the location is known). The Secretary shall make the determination required to carry out the provisions of this section not later than 90 days after the notification by the insurance beneficiary and shall make payment in full on the amount of the beneficiary's loss pending completion of the due diligence investigation.

(b)EFFECT OF PAYMENT OF LOSS
Upon payment of the amount of the loss pursuant to subsection (a) of this section, the United States shall be subrogated for all of the rights of the holder of the obligation upon the insured loan and shall be entitled to an assignment of the note or other evidence of the insured loan by the insurance beneficiary. If the net recovery made by the Secretary on a loan after deduction of the cost of that recovery (including reasonable administrative costs and collection costs, to the extent set forth in regulations issued by the Secretary) exceeds the amount of the loss, the excess shall be paid over to the insured. The Secretary may, in attempting to make recovery on such loans, contract with private business concerns, State guaranty loan insurance agencies, or State guaranty agencies, for payment for services rendered by such concerns or agencies in assisting the Secretary in making such recovery. Any contract under this subsection entered into by the Secretary shall provide that attempts to make recovery on such loans shall be fair and reasonable, and do not involve harassment, intimidation, false or misleading representations, or unnecessary communications concerning the existence of any such loan to persons other than the student borrower.

(c)FORBEARANCE NOT PRECLUDED
Nothing in this section or in this part shall be construed to preclude any forbearance for the benefit of the student borrower which may be agreed upon by the parties to the insured loan and approved by the Secretary, or to preclude forbearance by the Secretary in the enforcement of the insured obligation after payment on that insurance. Any forbearance which is approved by the Secretary under this subsection with respect to the repayment of a loan, including a forbearance during default, shall not be considered as indicating that a holder of a federally insured loan has failed to exercise reasonable care and due diligence in the collection of the loan.

(d)CARE AND DILIGENCE REQUIRED OF HOLDERS
Nothing in this section or in this part shall be construed to excuse the holder of a federally insured loan *from exercising reasonable care and diligence in the making and collection* of loans under this part. If the Secretary, after a reasonable notice and opportunity for hearing to an eligible lender, finds that it has substantially failed to exercise such care and diligence or to make the reports and statements required under section 1078(a)(4) of this title and section 1079(a)(3) of this title, or to pay the required Federal loan insurance premiums, the Secretary shall disqualify that lender for further Federal insurance on loans granted pursuant to this part until the Secretary is satisfied that its failure has ceased and finds that there is reasonable assurance that the lender will in the future exercise necessary care and diligence or comply with such requirements, as the case may be.

(e)DEFAULT RATE OF LENDERS, HOLDERS, AND GUARANTY AGENCIES

FLOWCHART ILLUSTRATION – 2 Continued 20 U.S.C §1080 & 31 U.S.C.§3716 ECMC made Material Misrepresentations to DOE, U.S. Treasury IRS & CFPB



| Enterprise-ECMC-GA of NYCHP Loans #'s 1, 2, 3 and 4 Default | | | |
|---|---|---|---|

| Item(s) | Guarantee Agency | AI's & Prin./Int. | Credit Collector Efforts |
|---|---|---|---|
| Loan #1 | ECMC-GA/Navient-Servicer | NYCHP | TransWorld Systems, LLC |
| Loan #2 | ECMC-GA/Navient-Servicer | $37,469.46 | |

| U.S. TREASURY DEPARTMENT GARNISHMENT | IRS OFFSET NON-TAX ALLEGED 2014 DEBT |
|---|---|
| ECMC 7/8/2016 received $170.85 | $461.00 |
| ECMC  8/12/2015 received $170.75 | |
| ECMC 9/9/2015 received $170.85 | |
| ECMC 10/12/2015 received $170.85 | |
| Total garnished: $638.40 | Total tax offset $461.00 |

ECMC defaulted education loans #1 and 2; April 13, 2016 Navient admits were refunded by NYCHP on February 4, 2009.  Exhibit 3, pages 4 thru 7; Exhibit 5.

NOTE: Relator did not attend NYCHP when loans #1 and 2 were disbursed on 12/8/2008 according to FAT. NYCHP expelled Relator 11/2008 over transfer of credit dispute. See Flowchart Illustration, 'A' above, **Exhibits 1, Pages 84; 26-27** – NYCHP Apknar letter and Haffner letters.   Loans #1 and 2 were not authorized by borrower who was expelled earlier; borrower did not return to NYCHP after being expelled on 11/2008 thru 4/20/2009 for the remaining loan period.

Nevertheless the same two unauthorized loans are part of loans defaulted by ECMC that it also alleged to IRS and the U.S. Treasury Department were non-tax federal debts owed, wrongfully.  Exhibit –3, pgs. 4 – 8; U.S. Treasury garnishment initiated by ECMC, Exhibit 3, pages 4-8; IRS- Exhibit 3, page 65 -67 to offset alleged education loan deb that included fraudulent education loan certifications. Loans 1 and 2 collected by ECMC/Navient are for account number 9883705172 and Exhibit 5 Navient/Sallie Mae failure to validate or comply with 34 CFR 682.208 Due Diligence in Servicing Education Loan and Validation of Debt reply dated April 13, 2016.

---

**(1)**IN GENERAL -The Secretary shall annually publish a list indicating the cohort default rate (determined in accordance with section 1085(m) of this title) for each originating lender, subsequent holder, and guaranty agency participating in the program assisted under this part and an average cohort default rate for all institutions of higher education within each State.

## FLOWCHART ILLUSTRATION – 3
### *UNLAWFUL DEBT* COLLECTION USED MAIL, WIRE, EXTORTION AND RETALIATION TOWARDS RELATOR RICO & SABINE OXLEY FAILED *INTERNAL CONTROL* TO CONDUCT DUE DILIGENCE FOR DEBT

Civil RICO Act prohibits the use of mail and wire to collect an unlawful debt that caused injury in the business of property of another, 18 U.S.C. 1964 et sec., Whoever in anyway or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be filed under this title or imprisoned not more than twenty years or both.

| SCHOOLS | CCNM | ATOM | PCOM | NYCHP |
|---|---|---|---|---|
| False Certifications | 6/05-12/15/05 | 1/07-1/4/07 | 7/07-12/14/07 | 11/03-4/20/09 |
| Reasons | Withdrew | Withdrew | Withdrew | Expelled |
| P&I Alleged debt (FAT 10/28/15) | $23,295 | $45,780 | $14,298 | $18,618 |
| P&I Alleged debt (Credit Report 4/10/16) | $18,500 | $29,043 | $18,500 | $29,818 |
| **UNKNOWN-CREDIT REPORT** | $61,439.00 | | | |
| US POSTAL MAILS | | | | |
| TransWorld Systems, Inc. | | | | 2- 9/6/15 |
| Account Control Technologies, Inc. | | | | 1- 3/14/16 |
| Allied Interstate, LLC – 1-unknown- Dated 11/24/2015 | $60,337.41 | | | 4 |
| US POSTAL MAIL/EMAILS | NUMBER | NUMBER | NUMBER | NUMBER |
| Navient   mailed bills & email | 43- mailed payment demands 3/3/15 thru12/20/15 22 mailed payment demands 12/21/15-5/12/16 July 28, 2008 – 2/23/16 NAVIENT/SALLIE MAE emailed 60 items for a total of 125 mail and wire fraud bills to Relator to demand repayment for unlawful debts | | | |
| ECMC  mailed bills & email | | | 1–10/26/15 1-10/26/15 | |
| TransWorld, LLC mailed debt bills | | | | |
| Allied Interstste, LLC mailed bills | | | | 1-11/24/15 |
| Account Control Technologies, Inc. bills | | | | |

Total alleged student debt $175,762.91 ($61,439 + $60,337.41 + $53,986.50) via unauthorized certifications sent by AI's Exhibits 4 – Analysis of Equifax National Credit Report; Flowchart 3 – false certifications above).  Collectively more than 75 individual mailed items were sent to Relator using the U.S. Postal mails and wire to collect on an unlawful extorted wrongfully claimed education loan debt.

FLOWCHART 4A - ADMISSION AGAINST PECUINARY, PROPRIETARY AN DPENAL INTEREST -February 4, 2009 through April 13, 2016 Navient Knew or Should have Known NYCHP, student loan certifications and its alleged education loan debts were false; it collected unlawful debts, breached fiduciary duty, public trust and defrauded Relator

| TABLE 4A -February 4, 2009, NAVIENT Had Knowledge of Unlawful Debts of NYCHP | | | |
|---|---|---|---|
| Loan# | 10/28/15 FAT – Exhibit. 2 | 4/10/16 Equifax credit report Exhibit 4 | 4/13/16 Navient Exhibit 5 |
| 1 | $5,549.00 | $5,597.00 | $4,250.00 |
| 2 | $7,533.00 | $7,662.00 | $6,000.00 |

Navient's April 13, 2016 correspondence it prepared in response to Relator's March 10, 2016 demand that it validate alleged debt, Navient admitted it knew the debt was refunded; yet it charged Relator.  It also failed to refund interest as it made no mention of interest it has levied on unlawfully extorted debt.

The FAT' debt has $13,082.00, the Equifax credit report debt for two same loans was $13,259.00 whereas the Navient refund accounted for only $10,250.00.  A difference of $1,832.00 and $1,009.00 respectively exists along with the harmed derogatory information it placed onto Relator's credit report on 3/16/16.

The fuller review of the NYCHP alleged debt reveals the following on Table 6B

| TABLE 4B -February 4, 2009, NAVIENT Had Knowledge of Unlawful Debts of NYCHP | | | |
|---|---|---|---|
| Loan# | 10/28/15 FAT – Exhibit. 2 | 4/10/16 Equifax credit report Exhibit 4 | 4/13/16 Navient Exhibit 5 |
| 1 | $5,549.00 | $5,597.00 | $4,250.00 |
| 2 | $7,533.00 | $7,662.00 | $6,000.00 |
| 3 | $7,528.00* | $8,039.00 | |
| 4 | $8,008.00* | $8,620.00 | |

Note * Not authorized by Relator, see Exhibit 11, pg. 37.

## B.  False Material Misrepresentations By The Enterprise and Agencies to Federal Government Investigators violates 18 U.S.C.1001

Federal statute 18 U.S.C. 1001 (a) prohibits, in any matter within the jurisdiction of

the executive branch of the Government of the United States, knowingly and willfully—

(1)  falsified, concealed, or covered up by any trick, scheme, or device a material facts regarding the true disposition or returned unpaid refunds; e.g., Exhibit 5,

(2) makes any materially false, fictitious, or fraudulent statement or representation; e.g., Exhibit 3, pgs. 4 thru 8 and 66 thru 67; Exhibit 5, pg. 2.

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; Exhibit 5.

Enterprise and agencies made false statements to:

    I.        Consumer Financial Protection Bureau – Exhibit 3 pg. 18-19, pg. 27-29; and 32-33 and Exhibit 5;

    II.       U.S. Department of the Treasury, Exhibit 3 pg. 18-19, pg. 27-29; and 32-33 Exhibit 5, Exhibit 3 pgs.4 thru 8;

    III.     Internal Revenue Service, Exhibit 5, Exhibit 3 pgs.4 thru 8 and

    IV.     U.S. Department of Education, Office of Inspector General Exhibit 3 pg. 18-19, pg. 27-29; and 32-33; Exhibit 5, Exhibit 3 pgs.4 thru 8;

As early as October 2015, Relator informed Navient/ECMC-Enterprise that NYCHP administration terminated attendance on November 2008.  Loan #1, had a disbursement for $6,000.00; # 2 the disbursement was $4,250.00.  Since Relator did not attend that AI since November 2008; she also did not receive either loan's disbursement.

    US-DOE/PA, however reported both loans as due and owing repayment from the Relator, similarly, loans #1 and #2 are part of ECMC'S defaulted loans.

## PARTIES

U.S. Department of Education, located in Wilkes-Barre, PA, Navient, Inc., (once known as Sallie Mae); Michele Ahmad, Consumer Advocate for Navient; Educational Credit Management Corporation, (ECMC) and their respective personnel Ms. Pam Esaw, Advocate personally and professionally; Student Assistance Foundation, collectively called the *Enterprise.*

AlliedInterstate, LLC, AlliedInterstate's Ms. Melanie Engberg, Assistant Vice President Compliance personally and professionally, TransWorld, Inc., and Account Control Technologies, Inc., collectively known as the *Agencies.*

New York College of Health Professions, (NYCHP); Rezan Apkinar, Steve Haffner; Pacific Institute of Oriental Medicine, (PCOM), Atlantic Institute of Oriental Medicine, (ATOM), Canadian College of Naturopathic Medicine, (CCNM), Laura Sun; and the University of Bridgeport College of Naturopathic Medicine, (UB), John Doe Academic Board Director Dr. Zamperino and Professor Gaulton, collectively called the Academic Institutions, (AI).

The Enterprise and Agencies used the U.S. Postal Mails, electronic means and demanded repayment of Relator(s) who disputed the alleged debt, it failed to validate the same alleged debt as requested by Relator and it was an unlawful debt.

COMPLAINT
COUNT 1 – FALSE CLAIMS ACT WHISTLEBLOWER
*ACADEMIC INSTITUTIONS*

## I.    ACADEMIC INSTITUTIONS

A.    Defense to Repay: UB's College of Naturopathic Medicine (CNM)

    i.    Academic Integrity–*Cheated Embryology I, & II Midterm and Final 2003-2004;*
          Substantial Misrepresented Catalogue Naturopathic Medicine Program's Basic
          Science Core Lecture and *Laboratory* Courses; It Breached Public Trust

UBCNM BREACHED FED AND STATE AGREEMENTS; VIOLATED EDUCATION, CONSUMER RIGHTS
AND TORT LAWS TO WARRANT REVOCATION OF ITS EDUCATION PERMITS AND
AUTHORIZATIONS, DUE TO ITS 2002-2004 FRAUDULENT CATALOGUE, ACADEMIC INTEGRITY
(CHEATING) AND BREACH OF PUBLIC TRUST

    1.    UBCNM breached agreements with DOE, New England Association of Schools and

Universities, (NEASU) and National Association Agency for Clinical Laboratory Sciences, (NAACLS)

its accreditation entities that it contracts, uses to assess and audits standards for accreditation and

anticipates schools and universities self-assess its delivery, integrity and academic program as

defined and agreed.  Violation and or non-compliance with Fed and State Accreditation warrants

termination of its Program Participation Agreement, (PPA) with DOE and revocation of its

education permit under Connecticut laws due to fraud found at UBCNM during 2002-2004 as

substantiated by a faculty member and student in the CNM program from 2003-2004.

    2.    UBs' documented 2002-2004 Catalogue influenced Relator to seek admission, attend

and then transfer from UB once it was discovered its program was not delivered as described in

Catalogue with regard to Basic Sciences core lecture and laboratory practical application as program

benefits claimed therein.

    3.    UBCNM received from the United States government $18,500.00 in federally insured

student loans for Relator to cover tuition.

4.      According to the FAT, Relator's principal and interest debt totals $29,394.00 owed to ECMC.

5.      ECMC alleged the UBCNM debt was due and owing based upon education attained by Relator.

6.      ECMC alleged the debt was past due.

7.      ECMC alleged the debt was defaulted.

8.      UBCNM's substantial material misrepresentations of fact made statements in its 2002-2004 catalogue fraudulent regarding Basic Science core lecturer and laboratory practical exposures intended to prepare students to resolve, treat or cure conditions of their clients.

9.      Relator relied upon UBCNM's 2002-2004 Catalogue to borrower' detriment.

10.     The same 2002-2004 Catalogue is a pivotal document that reveals multiple material misrepresentations of fact regarding delivery and quality of Basic Science Courses that influenced Relator's choice in relying upon its contents and to decide to attend UB's College of Naturopathic Medicine.

11.     UBCNM breached its PPA – Program Integrity standards with the DOE.

12.     UBCNM breached its Accreditation contract terms and conditions with NEASU and NAACLS in 2003-2004, when students cheated on Embryology I and II midterm and final examinations.

13.     UBCNM breached its Accreditation contract terms and conditions with NEASU and NAACLS during 2003-2004, since its catalogue discussed five Basic Sciences with core and laboratory course components, but did not offer laboratory facilities for the charged component.

14.     UBCNM breached its mandated compliance in its PPA to fulfill its Due Diligence, Fiduciary Duties and promote of integrity in its programs with DOE and its Accreditation firm.

15.     UBCNM violated Relator's Connecticut Consumer Unfair Trade Act rights and Connecticut' Education Department laws, Specifically, Sec. 10-145d-613, Connecticut' education-revocation of permits, discuss provisions for its education laws against fraudulent intent whose proofs require a clear and convincing evidentiary and elemental standard to assert.

16.     Relator's relied upon the 2002-2004 UBCNM Catalogue to make a decision to attend that program based on the described delivery therein.

17.     Relator's academic transcript shows she was enrolled in the 2003-2004 academic year.

18.     Professor Christopher Bennett's taught Embryology I and II during academic year 2003-2004 to both Naturopathic Medicine and Chiropractic students.

19.     Professor Christopher Bennett's curriculum vita shows he was a faculty member from 2002-2004.

20.     Professor Christopher Bennett commented on the cheating that occurred in Embryology 2003-2004 in the below emailed string dated June 1-2, 2016.

21.     Professor Christopher Bennett did not communicate the Embryology cheating because of an earlier cheating episode that UB failed to take action to prevent during 2002.

22.     Relator reported an Anatomy I irregular unethical conduct of Professor Gaulton, professor who provided 100-questions to students to study for midterm examination.

23.     Relator argued to the Board of Academics that Professor Gaulton's ineffective teaching was a means to get around the teacher evaluation and mislead UB's ability to deliver the program as described in its 2002-2004 catalogue.

24.     UB breached the public trust to make it appear that students succeeded on their own merits when in fact the benefit to the students was stymied and promoted cheating among students which is intended to develop minds, research ability and facilities that graduate unprepared Practitioners by promoting regurgitation of memorized answers to questions without the ability to resolve issues of client health but cause its decline.

25.     When Professor like Gaulton prepare questions; and Professor Bennett does not; Relator argued students weak in study methods come to expect questions to prepare; when questions are not provided, they find other ways to obtain advance access to exams; that is UB promotes cheating among its students.

26.     Relator participated in a requested academic integrity hearing. Professor Gaulton who taught Anatomy 1 for 2003 semester.

27.     Dr. Zamprino, graduate of UBCNM, academic head who was a licensed MD and another white male attended the hearing requested to discuss the ethical propriety of providing student with 100 questions to study for the Anatomy 1 Basic Science course and then use 75 of the 100 questions in the actual examination.

28.     Relator was not informed of any outcome that resulted in any changed approaches to cheating that occurred at UBCNM, or irregularities ethically with funneling questions and using 75 of the 100 or a significant number of questions in the exam and any evidence of grade changes.

29.     Relator or Professor Bennett are not aware of any corrective actions taken by UB's administration for any of the three known cheating and ethical academic irregularities events that occurred between 2002-2004.

30.     Instead those events caused a transfer and resignation of Relator and Professor Bennett respectively.


A.     GOVERNMENT REQUIRES PPA TO COMPLY WITH PROGRAM INTEGRITY

31.     HEA requires fiduciary duty from PPA's who are required to meet the requirements established pursuant to part H – Program Integrity- of the Act by the Secretary and national accrediting agencies.

32.     U.S. Higher Education Act of 1965, 34 CFR Sec 495 Part H requires (2) by amending subpart 1 (20 U.S.C. 1099a et seq.) regarding the State's role, 'Subpart 1--State Role §495. State Responsibilities requires:

> (a) STATE RESPONSIBILITIES- As part of the integrity program authorized by this part, each State, through one State agency or several State agencies selected by the State, shall--
>
> > (1) furnish the Secretary, upon request, information with respect to the process for licensing or other authorization for institutions of higher education to operate within the State;

(2) notify the Secretary promptly whenever the State revokes a license or other authority to operate an institution of higher education; and

(3) notify the Secretary promptly whenever the State has credible evidence that an institution of higher education within the State--

'(A) has committed fraud in the administration of the student assistance programs authorized by this title; or

'(B) has substantially violated a provision of this title.

B.       CONNECTICUT STATE EDUCATION LAWS IN UBCNM'S CATALOGUE ON BASIC SCIENTIFIC COURSES

33.       Connecticut State Department of Education, **Sec. 10-145d-613** discusses grounds for revocation of permits and authorizations[8] for specific reasons.

---

[8]   **Procedures to Implement Section 10-4b of the Connecticut General Statutes as Amended by P.A. 79-128 Section 14 in pertinent part:**

**Sec. 10-4b-1.  Definitions**
        For the purposes of these regulations:
        (a)  "Commissioner" means the Commissioner of Education;
        (b)  "Complaint" means a written document which complies with the requirements of Section 10-4b-3 of these regulations;
        (c)  "Substantial complaint" means a complaint that sets forth basic facts which state a cause of action concerning an alleged violation of the educational interests of the state;
        (d)  "Educational interests of the state" means those defined in Section 10-4a of the General Statutes as amended by Section 10 of Public Act 79-128;
        (f)  "Board of education" means a local or regional board of education;
        (g)  "Complainant" means the individual(s) or the Board alleging in a complaint that a board of education has failed or is unable to implement the educational interests of the state;
        (h)  "Respondent" means (1) the board of education against which a complaint has been filed; and
        (i)  "Parties" means (1) the complainant;
        (2) the respondent; and
        (j)  "Response" means a written reply by a respondent to a substantial complaint;
        (k)  "Days" means business days, which shall include all days of the week except Saturday, Sunday, and legal holidays defined pursuant to Section 1-4 of the General Statutes;
        (l)  "Completion of the inquiry" means the close of evidence;
        (m)  "Remedial Process" means a planned and systemic good faith effort by a board of education through which compliance with a finding of failure or inability to implement the educational interests of the state may be attained; and
        (n)  "Eligible person" means a resident, 18 years or over, of a local or regional school district, or a parent or guardian of a student enrolled in the public schools. (Effective April 7, 1980)

34.     Relator requests UBCNM's permit and authorizations be revoked for the following

reasons:

a.  UBCNM catalogue issued for academic years 2002-2004 made substantial material
    fraudulent misrepresentations that misled Relator to fully understand whether its program
    included both Basic Science core and *laboratory* aspects as documented and described in
    course offerings.
b.  Catalogue documented as early as 2002 was known to be false because UB did not have
    laboratory facilities for mandatory core courses completion and degree attainment.
c.  Academic integrity irregularities (cheating) occurred in Embryology I, II, taught by Professor
    Bennett; Anatomy I taught by Professor Gaulton and other courses as Professor Bennett
    discuss below before Relator's enrollment that dissuaded his reporting the Embryology
    episode.
d.  UBCNM, a participant in U.S. Department of Education as a PPA, it breached its fiduciary
    duty owed the DOE, NEASU and Relator's fair trade consumer rights; where each sought
    not be deceived through UB's substantial misrepresented information, not receive benefit or
    gainful employment to warrant repayment of student loans obtained to attend UBCNM.  As
    a result Relator's *defense to repayment* is asserted because of the substantial
    misrepresentation about its academic program, its quality of education and inability to
    obtain gainful employment and
e.  UBNPM breached public trust.


C.  Connecticut's Definition: Fraudulent Intentional Misrepresentation


34.     State of Connecticut elements for fraudulent/intentional misrepresentation proofs

requires plaintiff to show and prevail on claims of fraudulent/intentional misrepresentation must prove:

1) that the defendant made a false representation as a statement of fact,
2) the statement was untrue and the defendant knew it was untrue,
3) the defendant made the false statement in order to induce the plaintiff to rely on the false
   statement, and
4) the plaintiff did rely on the false statement to (his/her) detriment.


35.     The plaintiff must prove the first three elements by clear and convincing evidence[9].

(He/she) must prove the fourth element by a preponderance of the evidence. *Dalia v. Lawrence*, 226

---

[9] 3.2-2  **Clear and Convincing Evidence** - Now an accusation of <*state cause of action*> is serious, and, therefore,
the law applies a higher standard of proof than is employed ordinarily in civil cases.  The party making such a
claim has the burden of proving it by clear and convincing evidence which is a more exacting standard than proof
by a preponderance of the evidence as I have previously defined that standard to you in regard to other claims in
this case.

Conn. 51, 78 (1993); *Miller v. Appleby*, 183 Conn. 51, 55 (1981); *DeLuca v. C.W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 546 (1978); *Cadle Co. v. D'Addario*, 268 Conn. 441, 455 (2004); *Correia v. Rowland*, 263 Conn. 453, 475 n.22  (2003); *Holbrook v. Casazza*, 204 Conn. 336, 358 (1987), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988); (*Clear and convincing evidence*) *Lopinto v. Haines*, 185 Conn. 527, 534 (1981); *Clark v. Drska*, 1 Conn. App. 481, 485-87 (1984).

> "The intentional withholding of information for the purpose of inducing action has been regarded . . . as equivalent to a fraudulent misrepresentation. 1 Restatement (Second), Contracts § 161. . . ."  (Citations omitted.)  *Pacelli Bros. Transportation, Inc. v. Pacelli*, 189 Conn. 401, 407 (1983).

### D.  Material Misrepresentations in UBCNM's 2002-2004 Catalogue and its Educational Delivery

36.     UB made material misrepresentations of fact to Relator who applied and was admitted, attended and transferred from UBCNM located at 126 Park Avenue, Bridgeport, CT 06604 in reliance upon its published 2002-2004 catalogue; Relator began Fall semester September 2003 and ended May 2004.   Relator detrimentally relied upon statements in the catalogue to CNM applicants for 2002-2004 academic years.

37.     Relator also relied upon Admission department's oral statements made during preliminary inquiry into decisions to attend that educational program.  Exhibit 6, pgs. 8 – 14 UB-Catalogue.

### C.  Connecticut Education Law 10-145(d)-613(a)(1) and (5) Grounds To Revoke Permit

---

Thus, a party cannot meet the burden of establishing <*state cause of action*> by simply producing evidence which is slightly more persuasive than that opposed to it, which would meet the burden of proof under the preponderance of evidence standard.  Instead, the party must produce clear and convincing evidence which is evidence that is substantial and that unequivocally establishes the elements of <*state cause of action*>, which I shall shortly explain to you.  Clear and convincing evidence is evidence that establishes for you a very high probability that the facts asserted are true or exist.

38.     The State of Connecticut recognizes grounds to revoke permit for the following reasons

in pertinent part:

(a) **Causes.**  Any permit issued by the Board may be revoked by the Board in accordance with procedures hereinafter established if the Board finds that one or more of the following just causes exist:

(1) The holder of the permit, hereinafter called "the holder," obtained the permit through *fraud or the misrepresentation of a material fact*;

(2) The holder has persistently neglected to perform the duties for which the permit was granted;

(5) *Other due and sufficient cause*, which includes but is not limited to failure to successfully complete the BEST assessment.

### D.  UB Knew in 2002 That Its Catalogue Was Untrue, It Mislead Relator in 2003 Willfully- Violation of 10-145(d)-613(a)(1)

39.     UBCNM obtained its permit using fraud or the misrepresentation of a material fact and

it misled Relator's enrollment discussion based on facts UB knew were fraudulent statements made in

its 2002-2004 UB-Catalogue for Naturopathic Medicine; specifically, Table UB-Catalogue below shows

four Basic Science courses as identified also in the UB documented catalogue. Core and laboratory

credits were charged:

| UB-CATALOGUE 2002-2004 – Exhibit UB-2002-2004 Catalogue | | | |
|---|---|---|---|
| TABLE - UB | | | |
| # | COURSE TITLE | CORE CREDIT | LABORATORY CREDIT |
| 1 | Anatomy 1 | 4 | 3 |
| 2 | Biochemistry | 2 | 1 |
| 3 | Histology 1 | 2 | 2 |
| 4 | Physiology 1 | 3 | 2 |
| | Total core & lab credits | 11 | 8 |

40.     Contrary to the course description, *UBCNM laboratory facilities* did not exist for the

three, e.g., Biochemistry, Histology and Physiology; of the four basic science classes comprising five (5)

of alleged laboratory exposures out of the 11 Core course lecturer credits.

41.     Relator paid for laboratory credits in tuition for all five credits, however, laboratories did not exist for Biochemistry, Histology and Physiology.

42.     UBCNM *made a false representation as a statement of facts* on multiple occasions as shown above.

43.     At the time of printing the 2002 Catalogue, *the multiple statements, e.g., Laboratory credit hours per course* before Relator was admitted and registered; UB known its course descriptions were *untrue* and UBCNM *knew it was untrue* September 2003 when Relator registered.  August 2003 when Relator considered UBCNM, the defendant *made the false statement in order to induce the plaintiff to rely on the false statement*; receipt of money tainted the intentional acts with deception that was relied upon a falsity UBCNM knew or should have known was a basis of a decision for Relator to accept admission, enroll and take courses that did not deliver its Catalogue described content.

44.     Relator used federally insured student loan borrowed money to pay tuition.

45.     Relator relied upon the statements made orally and written in the 2002-2004 catalogue to prepare for the rigorous course content for both core and laboratory exposures and the Relator-*plaintiff did rely on the false statement to (his/her) detriment* and indebtedness for worthless education that was a waste of time and money.

   E.   UBCNM's 2002-2004 Catalogue, Relator Relied Upon

46.     The 2002-2004 Catalogue described each of the four basic science courses as follows:

**Basic Sciences 511 – Anatomy 1** – this course provides an in depth study of the macroscopic human anatomy and it covers the structure of the trunk and neck regions.  Clinical aspects of the vascular and neurological relationships of these region will be emphasized.  Instruction includes lectures and *laboratories* with the dissection of human cadavers and study of prosections, bones, models and interactive multimedia software. 4 Lecture hours, *3 laboratory hours* 5.5 semester credits.

**Basic Sciences 512 – Histology** - This course is designed to provide the student with an understanding of microscopic human anatomy and its relationship to the cellular, tissue and organ level.  A strong emphasis is placed on the association between histological structure and function of the skeletal, muscular and nervous system. 3 lecture hours, *2 laboratory hours* 4 semester credits

**Basic Sciences 514 – Biochemistry** – This course is designed to provide the student with an understanding of the biochemical principles involved in maintaining functional integrity of the

STUDENT LOAN RELATOR FALSE CLAIMS WHISTLEBLOWER CASE

body through energetics and the principles involved in nutritional balance. 3 lecture hours, *2 laboratory hours* 4 semester credits.

**Basic Sciences -515 Physiology I** – this course emphasises the function of cellular structures which regulate homeostasis as well as their role in cell division and genetic control of protein synthesis.  Emphasis is placed on the role of the cell membrane in the control of cellular events, particularly the propagation of action potentials and their role in muscle contraction.  The effects of physiology on the hormones, their role in homeostasis, and functional changes associated with homeostasis are considered.  2 lecture hours, *2 laboratory hours* 3 semster credits

47.    UBCNPM's 2002-2004 catalogue has multiple material misrepresentations in its course offerings, descriptions and the delivery of education.

48.    The Catalogue was allegedly used to mislead prospective students, enrolled students and in its totality it was used to influence Relator by the material misrepresentations made it the 2002-2004.

49.    Misrepresentation refers to a statement made by a party to a contract that induces another to enter into a contract, which can be interpreted, as false or untrue. The misrepresentation must be both false and fraudulent, in order to make the party making it liable for damages.

F.    Connecticut Education Law 10-145(d)-613(a)(5) –
Academic Integrity (Cheating) Between 2002-2004

49.    Relator enrolled into Embryology I and II courses during Fall 2003 semester.  The courses were taught by Professor Christopher Bennett.  Exhibit – Professor Bennett CV.

50.    Additionally, Relator was enrolled into Anatomy I and Biochemistry, both Basic Science courses were dropped.

51.    Basic Science courses according to the 2002-2004 Catalogue stated each had a laboratory component.

52.    Anatomy did have a cadaver; however, Biochemistry did not have a laboratory facility.

G.    Embryology I and II Midterm and Final Exams Were Obtained

53.    Fall and Spring semesters 2003-2004 courses in Embryology several students obtained the mid-term and final exams. Exhibit — Professor Bennett Recollections about how students obtained Midterm and Final Embryology exams.

54.    Clear and convincing evidence is supported by the documented Catalogue and Professor Bennett's personal recollections shown below. Emailed string below are recollections about the Embryology I and II cheating; it is an excerpted email string of June 1-2, 2016:

### Professor Christopher Bennett's — Embryology I, II Academic Integrity Recollection

| | |
|---|---|
| Date of Event Professor Bennett's recollection | Academic year 2003-2004 — Embryology course described above Chris Bennett <cbennett@fhsu.edu> Hi, Yes, I remember the incident quite well and I know pretty clearly what happened, but there was nothing that would rise to the level of theft. I no longer have the scores or grades, but note that |
| | To RELATOR Jun 1 at 3:42 PM Chris Bennett <cbennett@fhsu.edu> Hi, Well, I do not remember you, but that is not surprising given my memory and the numbers of students who passed through my classrooms then and since. The Embryology I course was taught to a combine |
| Professor Bennett's additional knowledge of event | To RELATOR Jun 2 at 3:15 PM  Hi,  Well, I do not remember you, but that is not surprising given my memory and the numbers of students who passed through my classrooms then and since.  The Embryology I course was taught to a combined class of Chiropractic and Naturopathic students, and the incident about which you ask happened when I was giving the mid-term examination. I walked into the back of the classroom from the second floor and was walking down the left aisle [as seen from the front of the classroom]. About halfway down, I noticed a male student sitting on the left side of the aisle who was holding up and |

reading a copy of my exam. I was shocked, and though perhaps the thing to do would have been to take the exam from him and note down his name, I did not do either. At the time I surely knew who he was, but I did not write it down anywhere. I cannot remember if I said anything to the class before administering the exam, but I did administer it. After grading the exams I noted that the scores were significantly better than usual.

The common practice in the College of Chiropractic was to grade exams and post scores on one's door, but not to return the exams to students. That was what I did all the time, and so I did not alter the exams often and just reused them. Although it is possible that a student went into my office and found and removed a paper copy of the exam or copied a file off my computer [though I may not kept exam files on my office computer], it was my suspicion that an exam copy got out though my negligence. I would let students who were interested look over their graded exams in my office to see which questions they had gotten wrong. That was my usual practice, but one time during the previous semester, a quiet male asian student came to my office to look over his exam, and after I had provided it to him he asked if he could take it and sit down on one of the benches by the windows on the 3rd floor hallway. I gave him permission to do so, and sometime later he returned the exam to me. When the incident described in the paragraph above occurred, I immediately thought of that student and was convinced that he either took the exam down to the 2nd floor copier and copied it or allowed someone else to do so. I assumed that the exam somehow got into the hands of students the next semester and was widely distributed among the students.

I probably discussed the incident with other faculty such as Dr. Gary Greenburg, whose office was next to mine, but I did not formally inform either the College of Chiropractic of the College of Naturopathic Medicine of the incident. What I did was to retest students on the material from the first half of the semester by adding questions covering that material to the final examination. I found that many students did much more poorly on the retested material than they had done on the midterm, but I did not discard midterm scores or sanction the students in any way. Rather I simply included the scores on the retest of the material in the final grades for Embryology I. I compiled the data and presented it to the class at the beginning of Embryology II in the spring semester. As luck would have it, the charts showing

the data are still preserved in the first PowerPoint presentation of that semester (see attachment). The first of the three slides shows the grade distribution from Fall 2002 on the left with a broad spread of scores such that I curved it as A > 75 > B > 55 > C > 40. At right is the grade distribution from Fall 2003 with a very skewed distribution such that I used A > 90 > B > 80 > C > 70, and still had mostly As. The second slide has the scores from the 2003 midterm plotted in order from high to low, and the third slide has the scores from Part 1 of the Fall 2003 final exam which retested over the material from the midterm plotted with the midterm scores. It is apparent from the third slide that many students who had done very well on the midterm did not do well at all on Part 1 of the final exam. It seems likely that at least a third of the class benefited from advance knowledge of the exam. I suspect that many students from that cohort of students beginning in Fall 2003 know more than I about the students' side of things, but though I was friendly with several of the students, the matter was never discussed.

Why did I not formally inform the colleges of the incident? Two reasons: 1) I felt that I was responsible for the incident by virtue of my allowing a student to take an exam out of my sight; and 2) previous experience had led me to believe that nothing would be done had I notified the colleges. The previous year during a Physiology 1 lecture to the chiropractic students I was discussing melatonin and commented that some Indian mystics and spiritual men would drink their first urine after sleep which would include significant quantities of melatonin. The lecture was 2 hours with a 10 minute break, and after the break I noticed two or three male students acting suspiciously in the back of the room. When I investigated I found that they were examining several sleazy men's magazines [nothing as highbrow as Playboy or Penthouse], which included a photo spread of two women engaged in what is euphemistically referred to as 'water sports.' I confiscated the magazines and brought them and the incident to the attention of Dr. Onorato, the Assoc. Dean, and nothing was done.

I hope this answers your questions.

Best wishes,

S. Christopher Bennett, PhD - Department of Biological Sciences - Fort Hays State University
600 Park Street

Hays, KS 67601
Office: 326 Albertson Hall
Ph.: 785-628-5333
Fax.: 785-628-4153
Http:/bigcat.fhsu.edu/biology/cbennett/


Exhibit – Professor Bennett's Recollections on Academic Integrity irregularities at UBCNM and the Chiropractic schools as early as 1999 by his personal knowledge of events.


    H.      **Anatomy 1–Cheating Facilitated 75/100 Practice Exam Used On Test**

    55.    UBCNM Anatomy course enrolled, Professor Gaulton provided students at the mid-term with a list of approximately 100 what he called, 'sample questions' to self-test over the semester's breaks.

    56.    Upon taking the exam Relator noticed approximately 75 of the questions on the exam was directly from the 100, 'sample questions.'

    57.    Relator raised the objection to academic department personnel, met with the head of medical education and the team selected for review of the irregularity.  Nothing came from that objection.

    I.      **Professor Resigned, Relator Withdrew; Transferred to CCNM**

    58.    Professor Bennett resigned from and Relator withdrew from UBCNM because of the academic integrity and material misrepresented catalogue.  Relator transferred to Canadian College of Naturopathic Medicine, (CCNM) with the intent of continuing education.  Tuition paid to UBCNM by Relator totals over $29,000.00.

    59.    After transfer from UBCNM to CCNM, the benefit of UBCNM's education quality and delivery showed its education was not effective.

    60.    Relator failed basic science courses because the education provided by UBCNM offered no benefit and Relator mislead to pay for an education that defrauded Relator because of the material misrepresentations made by UBCNM in its catalogue.

61.     A Jurist Doctorate holder, Relator at CCNM earned an A+ from that accredited law school prior education.

J.     **Substantial Misrepresentations; No Gainful Employment**

62.     Relator has not had opportunity to obtain gainful employment due to the substantial misrepresented fraud that mislead and deceived Relator to enroll into UBNPM.

K.     **Breached the Public Trust and Consumer Protection of Connecticut**

63.     John Adams, President of the United States (1797-1801) regarding education and the public trust, he stated,

> *"[T]he whole people must take upon themselves the education of the whole people and be willing to bear the expenses of it. There should not be a district of one mile square, without a school in it, not founded by a charitable individual, but maintained at the public expense of the people themselves."*

64.     In Connecticut, many outstanding educational institutions exists, including universities, community colleges, technical education schools, magnet public schools, and many exemplary local public schools.  It and this nation recognize that public education is the foundation of our republic. It prepares us to participate in our democratic society and practice our constitutional freedoms of life, liberty, and the pursuit of happiness.

L.     **Connecticut: Consumer Protection, Unfair Trade Practices Laws**

65.     The Consumer Protection Department's focus is on protecting consumers from unfair and deceptive business practices through its representation of the Connecticut Department of Consumer Protection, consumer education, complaint mediation, investigations, appearances before state and federal agencies, and litigation under various state and federal laws, primarily the Connecticut Unfair Trade Practices Act (CUTPA)

M. **Accreditation body: New England Association of Schools and Colleges (NEASC),–University of Bridgeport Breached The Public Trust**

66.     Founded in 1885, the New England Association of Schools and Colleges (NEASC) has been working to establish and maintain high standards for all levels of education -- from pre-kindergarten to the doctoral level - longer than any other accreditation agency in the United States. The Commission on Institutions of Higher Education (CIHE) of the New England Association of Schools and Colleges is the regional accreditation agency for colleges and universities in the six New England states: Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont.   NEASC accredits UBCNM, which is recognized by the U.S. Secretary of Education as a reliable authority on the quality of education for the institutions it accredits.  Exhibit 6, pgs. 32-33

67.     NEASC has a Commission.  It is also recognized by the Council for Higher Education Accreditation (CHEA), affirming that its Standards and processes are consistent with the quality, improvement, and accountability expectations that CHEA has established.  UB also alleged it was accredited by the National Accreditation Agency for Clinical Laboratory Sciences, (NAACLS).  Exhibit 6, pgs. 332 and 34

N.  **Policy Statement:  Institutional Effectiveness**

68.     In the current *Standards for Accreditation*, the Commission on Institutions of Higher Education has reaffirmed the importance of each institution measuring its effectiveness. An institution's efforts and ability to assess its effectiveness and use the obtained information for its improvement are important indicators of institutional quality. The Commission, through its evaluative processes, will appraise these quality indicators. Just as assessment is now a pervasive theme throughout the standards, so too should it be a theme in all comprehensive self-studies.

69.     The Commission views such assessment as a means of enhancing institutional effectiveness. The assessment process requires the gathering and analysis of evidence of congruence between an institution's stated mission, purposes, and objectives and the actual outcomes of its

programs and activities. In order to inform its planning, decision-making, and resource allocation, an institution needs to determine how well and in what ways it is accomplishing its mission and purposes. Moreover, the institution needs documentary evidence to support assertions of quality made in its self-study and in its communications with its constituencies.

70.     The Commission expects each institution, as part of its dedication to institutional improvement, to monitor its effectiveness in achieving its mission and purposes. Accordingly, the institution collects and analyzes relevant data and uses this information in the institutional planning process as a basis for sustaining quality and self-improvement. Thus, assessment functions as a tool for the encouragement of such improvement as well as a basis for quality assurance.

O.   **Policy Statement:  Student Achievement & Success**

71.     In carrying out its accreditation responsibilities, the Commission on Institutions of Higher Education seeks to ensure that its decisions take into account the degree to which an affiliated institution assesses student achievement and student success and uses the results of its assessment to improve its offerings, matters explicitly addressed in the Standards for Accreditation. Part of the Commission's responsibility as a recognized reliable authority on the quality of education is to provide institutions with a report that addresses how well it meets the Standards for Accreditation, noting those areas where improvement is needed; a second function of the reports is to address "The institution's or program's performance with respect to student achievement." To this end, team chairs should ensure that the evaluation reports they prepare specifically address the extent to which an institution being evaluated fulfills the following criteria from the standards on Planning and Evaluation, The Academic Program, Students, and Public Disclosure[10].

---

[10] Planning and Evaluation

2.5 The institution regularly and systematically evaluates the achievement of its mission and purposes, giving primary focus to the realization of its educational objectives. Its system of evaluation is designed to provide relevant and trustworthy information to support institutional improvement, with an emphasis on the academic program. The institution's evaluation efforts are effective for addressing its unique circumstances. These efforts use both quantitative and qualitative methods.

2.6 The institution has a system of periodic review of academic and other programs that includes the use of external perspectives.

2.7 Based on verifiable information, the institution understands what its students have gained as a result of their education and has useful evidence about the success of its recent graduates. This information is used for planning and resource allocation and to inform the public about the institution.

The Academic Program

4.3 Each educational program demonstrates coherence through its goals, structure, and content; policies and procedures for admission and retention; instructional methods and procedures; and the nature, quality, and extent of student learning and achievement. The institution offering multiple academic programs ensures that all programs meet or exceed the basic quality standards of the institution and that there is a reasonable consistency of quality among them. The institution provides sufficient resources to sustain and improve its academic program.

4.33 The evaluation of student learning or achievement and the award of credit are based upon clearly stated criteria that reflect learning objectives and are consistently and effectively applied. They are appropriate to the degree level at which they are applied.

4.35 Credit for prior experiential or non-collegiate sponsored learning is awarded only at the undergraduate level with appropriate oversight by faculty and academic administration. When credit is awarded on the basis of prior experiential or non-collegiate sponsored learning alone, student learning and achievement are demonstrated to be at least comparable in breadth, depth, and quality to the results of institutionally provided learning experiences. The policies and procedures for the award of credit for prior or experiential learning are clearly stated and available to affected students.

4.48 The institution implements and provides support for systematic and broad-based assessment of what and how students are learning through their academic program and experiences outside the classroom. Assessment is based on clear statements of what students are expected to gain, achieve, demonstrate, or know by the time they complete their academic program. Assessment provides useful information that helps the institution to improve the experiences provided for students, and to assure that the level of student achievement is appropriate for the degree awarded.

4.49 The institution's approach to understanding student learning focuses on the course, program, and institutional level. Evidence is considered at the appropriate level of focus, with the results being a demonstrable factor in improving the learning opportunities and results for students.

4.50 Expectations for student learning reflect both the mission and character of the institution and general expectations of the larger academic community for the level of degree awarded and the field of study. These expectations include statements that are consistent with the institution's mission in preparing students for further study and employment, as appropriate.

4.52 The institution's system of periodic review of academic programs includes a focus on understanding what and how students are learning as a result of the program.

4.53 The institution ensures that students have systematic, substantial, and sequential opportunities to learn important skills and understandings and actively engage in important problems of their discipline or profession and that they are provided with regular and constructive feedback designed to help them improve their achievement.

Students

6.5 The institution demonstrates its ability to admit students who can be successful in the institution's academic program, including specifically recruited populations. It ensures a systematic approach to providing accessible and effective programs and services designed to provide opportunities for enrolled students to be successful in achieving their academic goals. The institution provides students with information and guidance regarding opportunities and experiences that may help ensure their academic success.

6.6 The institution measures student success, including rates of retention and graduation and other measures of success appropriate to institutional mission.

6.7 Measures of student success, including rates of retention and graduation, are separately determined for any group that the institution specifically recruits, and those rates are used in evaluating the success of specialized recruitment and the services and opportunities provided for the recruited students.

P.     Accreditation: Public Disclosure

71.     The AI publishes statements of its goals for students' education and the success of students in achieving those goals. Information on student success includes rates of retention and graduation and other measures of student success appropriate to institutional mission. As appropriate, recent information on passage rates for licensure examinations is also published.

72.     The AI has readily available valid documentation for any statements and promises regarding such matters as program excellence, learning outcomes, success in placement, and achievements of graduates or faculty.

73.     Accreditation body CIHE requires teams to rely on the retention and graduation rates and other measures of student success that are included in the CIHE data forms at the end of the self-study.

74.     In preparing evaluation reports and recommendations to the Commission, consequently, teams should not only evaluate the institution's current status but address the institution's need to expand or follow-up its assessment activities and its attainment with respect to student achievement and student success to do so on a limited basis. However, it expects that in due time its assessment efforts will be more comprehensive, systematic, integrative, and organic.

75.     While assessment is an overall AI concern, as reflected in the various standards for accreditation, its primary focus is the teaching-learning experience. To the greatest extent possible, therefore, the institution should describe explicit achievements expected of its students and adopt reliable procedures for assessing those achievements.   Achievements of the NAACLS for Entry Level Clinical Assistant Competencies Core Module was not taught at UB's CNM 2003-2004 academic year of laboratory core course. The scientific equipment required to perform scientific laboratory inquiry did

---

6.8 The institution's goals for retention and graduation reflect institutional purposes, and the results are used to inform recruitment and the review of programs and services.

6.20 Institutions with stated goals for students' co-curricular learning systematically assess their achievement.

not exist at UB.  There was no means of equipment to determine suitability of specimens for chemistry procedure accord to; the test required, appropriate patient preparation/method of collection time of collection/processing or storage of specimen rejection criteria.  Exhibit I, pages 34 – 39.

76.     Ultimately, assessment and accreditation share the common goal of enabling the AI's to reach its fullest academic potential by providing the highest quality education possible. In pursuing that goal, institutional autonomy should be preserved, innovation encouraged, and the distinct character of each institution recognized and honored; such was not a part of UBCNM's 2003-2004 academic year.

P.  U.S. Department of Education's PPA Duties and
Defense to Repay Supported Under State Laws

77.     UNCNM's inaccurate or incomplete catalogue disclosures were misleading.  Relator relied upon UB's catalogue, NESCA, NAACLS, DOE and others who relied upon it to issue it a PPA, accreditation permit or authorization.

78.     UBCNM misrepresented plaintiffs because the basic science laboratory components were not as described in its publically issued Catalogue for academic year 2002-2004.

79.     UBCNM made intentionally inaccurate statements regarding the program's content, integrity of its delivery and about employment prospects of graduates of its programs. Its 'Mission' is a substantial misrepresentation, '*promotes academic excellence, personal responsibility and professional growth,*' did not occur during 2003-2004 academic year when Relator was traumatized by the failure of the Board or Academic Administration to response to the academic integrity that occurred to the best of Relator's knowledge, belief and proof at least two times during the period of attendance.  Relator relied upon the information in its catalogue, oral statements as to the success of its graduates from that program and academic integrity that it alleged it *promotes* in making a decision to select UBCNM or whether to attend another school.

80.     Relator through 'Accreditation standards' relied upon  that and the oral and written statements made in UBCNM's catalogue as occurred for earlier academics at the Bachelors, Masters and

Doctorate levels or prior education and that sought from UB; that is, to rely on UBCNM's New England

Accreditation Association status to hold that career training programs accountable and ensure that

"Instead of providing clear and accurate information to help students choose which college to attend,

UBCNP violated students' and taxpayers' trust,"[11]   Relator was not saddled with debt that cannot be

repaid and or suffer the risk of losing access to federal student aid as has been experienced by Relator.


## In Conclusion

Relator requests UBCNM's education permit and authorizations be revoked for:

1.    fraud, material misrepresentations in it 2002-2004 catalogue regarding laboratory exposure

for its basic science courses,

2.    academic integrity (cheating) for the mid and final examinations of Embryology and

Anatomy 1; and

3.    Its willful breach of the public trust that occurred 2002 - 2004.

Specifically, it assessed fees from students who used the U.S. Department of Education to cover

tuition costs for laboratory exposures not provided.

UBCNM misled Relator and other students to believe that their program would involve work in

its basic science classes that included laboratory components for five Basic Science courses' credits  as it

charged as part of tuition for academic year 2003-2004.  Five Basic Science courses' Core and

Laboratory components fees charged as part of tuition that together those would prepare Relator to

succeed at the program and in practice.

UBCNM's published 2002-2004 catalogue intended Relator to rely upon its described

Naturopathic Medicine program.

Relator relied upon the 2002-2004 catalog to borrower's detriment.

Relator attended during 2003-2004,

---

[11]  Under Secretary Mitchell-comment.

Relator was defrauded by UBCNM because its 2002-2004 catalogue was a documented material misrepresentation regarding five laboratory courses offerings with the five core Basic Science lecture component described in the catalogue.

**R.  AI's Used Relator's MPN Without Consent Or Authorization To Get Fraudulent, Deceptive Certifications  Paid When Relator Did Not Attend; Misconduct Breached Fiduciary Duty of PPA's Owed DOE**

Institutions that participate in the Title IV programs are subject to the highest standards of care and diligence in administering those programs and must account to the Department for all funds received under those programs consistent with 34CFR§668.82.

The governing regulations at 34CFR§668.22 require that a properly calculated return of Title IV funds be performed when a student *withdraws*, drops out, is *expelled* or otherwise fails to complete a payment period or period of enrollment.  The regulations further provide that a return of Title IV funds be paid to the original provider no later than 30-days after an institution has determined, or should have determined , that the student has withdrawn, been expelled or otherwise terminated his or her enrollment. 34CFR§668.22(j).

Federal Family Education Loan (FFEL) program, regulations provide that if the institution is unable to document that a registered student has attended school during the period of enrollment for which a loan is made, the institution must determine the student's withdrawal date, notify the lender of the lack of attendance, and return o the lender any proceeds credited to the student's account as required by 34CFR§682.604(d)(4), 682.605, 682.607(c).

Relator/Relator between 2003 through 2008 enrolled into five institutions.  As of June 2015 through today; all five knew or should have known that Relator/Relator had withdrawn, been expelled or otherwise terminated his or her enrollment; however, they have maintained approximately $79,008.00 in student loan funds unlawfully.

13.    NYCHP submitted fraudulent certifications for loans 1 and 2 when Relator did not attend.

14.     NYCHP obtained federal student loans 1 and 2 with guaranteed amounts totaling $20,500.00.

15.     NYCHP alleged it was disbursed $9,250.00.

16.     Enterprise demands an outstanding principal balance for loans 1 and 2 of $13,082.00.

17.     Agencies sought to collect loans 1 and 2's alleged debt.

18.     NYCHP did repay loans it obtained between 11/2008 through 4/20/2009.   However, since it terminated Relator(s) attendance 10/2008, it falsely submitted certifications.

19.     NYCHP did not provide an Exit Counseling interview after it expelled Relator.

20.     NYCHP does not have a signed authorizations for the amount of the disbursements for loans 1 and 2 with the signature of Relator affixed.

21.     PCOM received loan #6 with a guaranteed amount of $10,000.00.

22.     PCOM alleged loan #6 disbursement of $5,000.00 was repaid on 8/14/2007 to the Enterprise (Navient/Sallie Mae).

23.     PCOM does not have a signed authorization for the amount of the disbursement of Loan #6 with the signature of Relator affixed.

24.     PCOM did not provide Relator with an Exit Counseling interview.

25.     The Enterprise-Navient/Sallie Mae demanded an outstanding principal balance for loan #6 of $8,468.00 as of October 28, 2015.

26.     The Enterprise-Navient/Sallie Mae admitted December 4, 2015 that PCOM repaid $5,000.00.

27.     PCOM's then Registrar/Financial Aid Director Gerri Hatten admitted Relator did not attend after 8/2007.

28.     ATOM received loan #8 with a guaranteed amount of $18,500.00 and a disbursed amount of $12,333.00.

29.     ATOM received a #7 loan guaranteed for $10,543 and it disbursed the same amount to Relator.

30.    ATOM's tuition for 2006 was $11,000 a year and $3,666.00 per semester; for 2007 its tuition was $12,000. On Relator's credit report this loan's principal and interest totals $24,371.00.

30.    Relator attended ATOM from 5/2006-4/2007 a full academic year.  After 4/2007 Relator did not attend ATOM.  Relator did not use 2/3rd of the 2007 education loan.

31.    ATOM did not refund the unused portion of the 2007 education loan and did not provide Relator with Exit Counseling interview.

32.    CCNM received loan #10 with a guaranteed amount of $10,000.00 and a disbursement of $9,678.00.

33.    CCNM alleged loan #9 was guaranteed for $10,000.00 and a disbursement of $8,500.00 for a total of $18,500 USD in Canadian converted at January2005 rate of 2005 or 1/307 totaled $24,179.50. .

34.    Relator attended CCNM for Winter 2005 semester; that semester's tuition was $7,891.00 Canadian dollars or $6.039.00 USD.  Deducting $24,179.50-$6,039.00 leaves $18,140.50 unpaid refund that should be returned.

35.    The Enterprise-Navient/ECMC seeks to collect repayment from Relator for Loans 1, 2, 3, 4, 6, 8 and 10.

36.    The Enterprise has placed information about all student loans, including loans 1, 2, 3, 4, 6, 8 and 10 on Relator's national credit reports.

37.    The Enterprise as of June 2, 2015 was aware that Relator disputed the alleged student loan debt.

38.    The Enterprise knowingly presented or caused to be presented false or fraudulent claims to the Government through to the National Student Loan Data System, (NSLDS) regarding 12 student loans it alleged were authorized by Relator and are subject to repayments starting 8/2003 thru 4/20/2009.

39.    The Enterprise knowingly presented or caused to be presented false or fraudulent claims to the United States through the Consumer Financial Protection Bureau about Relator.

40.   The Enterprise-ECMC knowingly presented or caused to be presented false or fraudulent claims to the United States through the U.S. Treasury Department to garnish Relator's Social Security Retirement income.

41.   The Enterprise-ECMC knowingly presented or caused to be presented false or fraudulent claims to the United States through the Internal Revenue Service to allege it had a right to offset a federal debt's payment via confiscation of her 2015 federal tax refund.

42.   The Enterprise knowingly presented or caused to be presented false or fraudulent claims to the United States through its communications that misrepresented and misled Consumer Financial Protection Bureau, an executive government agency investigating Relator's complaint of disputed student loan debts.

43.   NYCHP knowingly presented or caused to be presented false or fraudulent claims to the United States through NSLDS to obtain student loans disbursed 1, 2, 3 and 4 at the material time from Winter 2008 through Fall 2008.

44.   NYCHP used Relator's identity and characteristics to obtain student loans #'s 1, 2, 3, and 4.

45.   NYCHP does not have cancelled checks with Relator's signature affixed on the disbursements for loan #'s 1, 2, 3 or 4 between the material dates of January 2008 through April 20, 2009.

46.   NYCHP breached its Program Participation Agreement had with the U.S. Department of Education during the material time beginning Winter, 2008 till today.

47.   PCOM knowingly presented or caused to be presented false or fraudulent claims to the United States through the NSLDS to obtain student loan disbursements for loan #'s 5 and 6 at the material times of Spring 2007 through December 14, 2007.

48.   PCOM knowingly presented or caused to be presented false or fraudulent claims to the United States using Relator's identity and characteristics to obtain loan #'s 5 and 6.

49.     PCOM does not have cancelled checks with Relator's signature affixed on the disbursements for loan #'s 5 and 6 it alleged were approved by Relator between material dates of August 2007 through 12/14/2007.

50.     PCOM breached the U.S. Higher Education Act of 1965 as a Program  time beginning Spring 2007 till today.

51.     PCOM breached its Program Participation Agreement had with the U.S. Department of Education during the material time beginning Spring, 2007 since it did not provide Relator with an Exit Counseling interview.

52.     ATOM knowingly presented or caused to be presented false or fraudulent claims to the United States through NSLDS for student loan disbursed loan #'s 7 and 8 it alleged were approved by Relator between 5/2006 – 4/2007.

53.     ATOM does not have cancelled checks with Relator's signature affixed on the disbursements for loan #'s 7 and 8 it alleged were approved by Relator between material dates of May 2006 through April 2007.

54.     ATOM used Relator's identity and characteristics to obtain loan #'s 7 and 8.

55.     ATOM breached its Program Participation Agreement it entered into with U.S. Department of Education at the material time of April 2006 through April 2007.

56.     CCNM knowingly presented or caused to be presented false or fraudulent claims to the United States through NSLDS for student loan disbursed loan #'s 9 and 10 it alleged were approved by Relator between 1/2005 – 8/2005

57.     CCNM does not have cancelled checks with Relator's signature affixed on the disbursements for loan #'s 9 and 10 it alleged were approved by Relator between material dates of January 2005 through August 2005.

58.     The Enterprise knowingly made, used, or caused to be made or used a false record or statement into NSLSD to get a false or fraudulent claim paid;

59. The Enterprise knowingly made, used, or caused to be made or used a false record or statement onto Relators' FAT to get a false or fraudulent claim paid

60. The Enterprise knowingly made, used, or caused to be made or used a false record or statement contrary to its PPA to get a false or fraudulent claim paid

61. The Enterprise knowingly made, used, or caused to be made or used a false record or statement onto Relators' national credit reports to get a false or fraudulent claim paid

61. The Enterprise-ECMC knowingly made, used, or caused to be made or used a false record or statements to Internal Revenue Service to offset Relator's 2015 federal tax refund to get a false or fraudulent claim paid,

62. The Enterprise knowingly made, used, or caused to be made or used a false record or statement onto Relators' NSLDS, FAT and her national credit reports and to the U.S. Treasury Department to garnish her Social Security Retirement income to get a false or fraudulent claim paid.

62. The Enterprise and AI's knowingly made, used, or caused to be made or used a false record into the NSLDS or statement onto Relators' FAT which alleged default occurred in repayment terms and conditions to get a false or fraudulent claim paid

    (3). Conspiring to defraud the Government by getting a false or fraudulent claim paid;
    (4). Falsely certifying the type or amount of property to be used by the Government;
    (5). Certifying receipt of property on a document without knowing that the information is true;
    (6). Knowingly buying government property from an unauthorized officer of the Government; or

(7). Knowingly making, using, or causing to be made or used a false record to avoid or decrease an obligation to pay or transmit property to the Government.[12]

**In Conclusion**

AI's breached their fiduciary duties owed to the Government, Accrediting organizations, violated Relator's rights under law and breached the public's trust through receipt of payments from the

---

[12] 31 U.S.C. § 3729(a) (2000).

Government that they knew or should have known were not authorized by Relator for educational purposes.

Breached PPA's warrant termination of agreements for all AI's involved in failing to return refunds or otherwise submitting unauthorized certifications.

# COUNT 2

Preceding Count(s) and paragraphs are incorporated by reference with this and other Counts

## II.      LENDERS

Lenders that participate in the Title IV programs are subject to the highest standards of care and diligence in administering those programs and must account to the Department for all funds received under those programs consistent with 34CFR§668.82.

The governing regulations at 34CFR§668.22 require that a properly calculated return of Title IV funds be performed when a student withdraws, drops out, is expelled or otherwise fails to complete a payment period or period of enrollment.  The regulations further provide that a return of Title IV funds be paid to the original provider no later than 30-days after an institution has determined, or should have determined , that the student has withdrawn, been expelled or otherwise terminated his or her enrollment. 34CFR§668.22(j).

### A.   LENDER BREACHED ITS FIDUCIARY DUTY TO DOE; E-SIGN ACT AND AUTHENTICATION OF RELATOR'S MASTER PROMISSORY NOTE (MPN)

A.  Relator Consent Required to Use MPN

   1.   Lender conducted electronic transactions using Relator's MPN.

2.  Before a lender or holder may conduct an electronic transaction that requires MPN information to be provided or made available in writing to a Relator, the Relator must affirmatively consent to use an electronic record.

3.  National Commerce Act ("E-sign") §101(c) required Relator to affirmatively consent to use of her identifying information to use an electronic record.

4.  The consent process used by the lender or holder must be designed to establish that the Relator understands that electronic records will be used instead of paper documents.

5.  The lender or holder may not use coercion, deceptive practices or misrepresent to obtain the Relator's consent; lenders do not have signed evidence of Relator's consent.

**B.    Relator's MPN Was Used Without Consent**

6.  Relator did not attend NYCHP during 11/2008-4/20/2009 when disbursements occurred 12/26/08 for $4,250.00 and for $6,000.00

7.  Navient servicer and ECMC lender did not receive consent of Relator to use her MPN for the 12/26/2008 disbursement for $4,250.00.

8.  Relator did not attend NYCHP during 11/2008-4/20/2009 when disbursements occurred 12/26/2008 for $6,000.00, DOE was aware Relator was not attending because it was investigating an expulsion by AI involving Relator.

9.  Navient servicer and EMCM lender did not receive consent of Relator to use her MPN for the 12/26/2008 disbursement for $6,000.00.

10.  The Lender or holder is responsible for obtaining all necessary consents.

11.  Relator did not consent to $8,500.00 guaranteed amount, Loan #1 of FAT, Exhibit 2.

12.  Relator did not consent to $12,000.00 guaranteed amount, Loan #2 of FAT, Exhibit 2.

13.  Relator did not consent to $8,500.00 guaranteed amount, Loan #3 of FAT, Exhibit 2.

14   Relator did not consent to $12,000.00 guaranteed amount, Loan #4 of FAT, Exhibit 2.

15.    Relator did not consent to $5,500.00 disbursed amount, Loan #3 of FAT, Exhibit 2.

16.    Relator did not consent to $5,000.00 disbursed amount, Loan #4 of FAT, Exhibit 2.

17.    E-Sign Act §101(c)(1) requires lender or holder provide Relator with a clear and conspicuous disclosure of:

a.    Any right or option he or she has to conduct a transaction on paper or in non-electronic form;

b.    His or her right to have documents provided or made available on paper at no charge to the Relator;

c.    His or her right to withdraw consent to participate in electronic procedures and the procedure for doing so.

d.    During an online session where the lender or holder seeks to obtain the Relator's consent to conduct a single transaction electronically (e.g., sign a promissory note), the Relator must be able to withdraw his or her consent during the session prior to completing the transaction.

e.    Alternatively, if consent sought by the lender or holder will initiate one or a series of subsequent transactions, the Relator must be informed that any consent provided may be withdrawn at any time;

f.    The consequences of withdrawing his or her consent to use electronic records;

g.    The scope of the consent, i.e., whether the consent applies to a particular transaction or other transactions,

h.    The hardware and software requirements for accessing, printing, and retaining , as appropriate, electronic records used in this transaction or covered under the scope of the transaction, lender did not receive Relator's consent and does not have written evidence to support its use from Relator whose MPN was used.

## C. Lender and PCOM Breached E-Sign Act and Their PPA Duties Owed Government

18.     Lender or holder did not provide Relator with required E-Sign Act §101(c)(1) required disclosures mentioned in 12 above parts a thru g.

19.     Relator attended PCOM for Spring 2007 semester.

20.     Relator did not attend PCOM after Spring 2007.

21.     Relator requested PCOM to refund the Fall 2007 loan.

22.     Relator did not attend PCOM to receive the disbursement made on June 7, 2007 in the amount of $5,000.00.

23.     PCOM informed Relator it refunded the $5,000.00 since Relator withdrew from PCOM in an email string dated September 2007 through December 2007 according to its Director of Financial Aid, Ms. Gerri Hatten.

24.     Relator did not consent on June 4, 2007 for the guaranteed amount of $10,000.00 for attendance at PCOM shown on her Financial Aid Transcript, (FAT).

25.     Relator did not consent on June 7, 2007 for $5,000.00 disbursement to PCOM.

## D. Lender And ATOM Breached E-Sign And PPA Fiduciary Duties Owed Government

26.     Relator did not consent to the guaranteed amount of $18,500.00 to ATOM dated January 4, 2007.  Instead, Relator consented to $8,500.00 crossed out by another.

27.     Relator did not consent to a disbursement $12,333.00 on January 4, 2007 as shown on Relator's FAT.

## E. Lender And CCNM Breached E-Sign and PPA Fiduciary Duties Owed Government

28.     Relator attended Canadian College of Naturopathic Medicine, (CCNM)  January 3, 2005 thru May 2005 semester for Winter semester.

29.     Relator did not attend CCNM after May 6, 2005 through August 19, 2005.

30.   Relator did not consent to guaranteed amount of $10,000.00 on FAT for CCNM on December 14, 2005 or its disbursement amount of $9,078.00.

31.   Relator Winter 2005 tuition was $7,891.00 Canadian dollars; or $6,039.00 when converted to USD using the January 2005 rate of 1:1.307.

## F.  Attribution Was Not Established By Lender or Holder of Relator's Loans

32.   Attribution is the process of associating the identity of a Relator with his or her signature.

33.   The lender or holder must maintain evidence sufficient to establish that the electronic signature may reasonably and effectively be attributed to the Relator purported to have provided the electronic signature.

34. Lender or holder did not comply with Attribution for Relator with regard to loans disbursed or guaranteed amounts for NYCHP, PCOM, ATOM or CCNM after Relator no longer attended respective AI or was expelled by AI.

## G.   Authenticating Relator's Identity Did Not Occur

35.   Before a lender or holder issues a shared secret or other credential that may be used by a Relator as part of a process to sign electronically a record for a covered transaction, the lender or holder must confirm the identity of the Relator by authenticating data provided by the Relator with data maintained by an independent source.

36.   At a minimum, the lender or holder must verify a Relator's name, social security number or driver's license and date of birth and his or her attendance.

37.   Lender or holder failed to authenticate Relators identity for NYCHP, PCOM, CCNM and ATOM and dates of attendance.

H.    **Timeframe To Provide Access Must Be Reasonable, It Was Not Reasonable**

38.    The lender or current holder must provide reasonable and timely access to the electronic records to a Relator from the time he or she executes a covered transaction until the loan is paid off.

39.    The lender or current holder must provide reasonable and timely access to the electronic records for an additional three years after loan(s) are paid off.

40.    Lender or current holder did not provide access to electronic records to Relator who requested validation of debt records beginning June 2, 2015 thru March 2016.


## COUNT 3 – COLLECTION OF UNLAWFUL DEBT

I.    **LENDER, HOLDER OR CURRENT HOLDER DEMAND REPAYMENT FOR LOANS RELATOR DID NOT CONSENT OR AUTHORIZE AND WAS NOT ATTENDING ACADEMIC INSTITUTION WHEN CERTIFIED**

41.    The Enterprise and their personnel demanded repayment of:

a.    NYCHP Loan(s) # 1, 2 3, and 4 that were unauthorized, and two were returned refunds.

b.    The Enterprise demands repayment for Loan #1 for $5,549.00 not consented to by Relator.

c.    The Enterprise demands repayment for Loan #2 for $7,533.00 not consented to by Relator when NYCHP terminated her enrollment.

d.    The Enterprise demands repayment for Loan #3 for $7,528.00 not consented to by Relator when she was not enrolled.

e.    The Enterprise demands repayment for Loan #4 for $8,004.00 not consented to by Relator when she was not enrolled.

f. The Enterprise demands repayment for Loan #5 for $5,830.00 not consented to by Relator.

g. The Enterprise demands repayment for Loan #6 for $8,648.00 not consented to by Relator when she was not enrolled.

h. The Enterprise demands repayment for Loan #7 for $20,809.00 not consented to by Relator.

i. The Enterprise demands repayment for Loan #8 for $24,371.00 not consented to by Relator when she was not enrolled.

j. The Enterprise demands repayment for Loan #9 for $10,177 not consented to by Relator.

k. The Enterprise demands repayment for Loan #10 for $13,118.00 not consented to by Relator, when she was not enrolled.

42. The Enterprise demands repayment of $53,986.50 for loans Relator did not consent their Guaranteed or disbursed mounts.

43. The Enterprise demands repayment of $53,986.50 for loans Relator when Relator was not attending the respective academic institution.

44. The Enterprise demands repayment of $79,008.00 principal and interest as outstanding balance amounts for Loan #'s 2, 3, 4, 6, 8, and 10 obtained by the respective academic institution when Relator did not authorize, consent or approve the loan's disbursements.

45. The Enterprise demands repayment of education loans by placing derogatory information onto Relator's national credit reports incorrectly.

46. The Enterprise demands repayment of principal and interest as outstanding balance shown on her FAT when it could not validate the alleged debt.

47.    The Enterprise demands repayment of principal and interest since June 2, 2015

through March 2016, when Relator requested it validate the alleged debt.

48.    The Agencies sought to collect Loan #'s 2, 3 and 4 from Relator.

49.    The Agencies used the U.S. Postal Mails to collect repayment for Loan #'s 2, 3, and 4.

50.    The Agencies used the phone to call Relator to collect repayment for Loan #'s 1, 2, 3

and 4 shown on Relator's FAT.

51.    The Enterprise demanded repayment from Relator for Loans 2, 3, 4, 6, 8, and 10

without ability to validate the alleged debt.

## III.    SERVICERS

52.    PPA's, 34 CFR 668.14 in pertinent part requires compliance with all aspects, for all

branches of the organization[13].

---

[13] 34 CFR 668.14 - Program participation agreement. § 668.14 Program participation agreement.

(a)
(1) An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. A program participation agreement conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.
(2) An institution's program participation agreement applies to each branch campus and other location of the institution that meets the applicable requirements of this part unless otherwise specified by the Secretary.
(b) By entering into a program participation agreement, an institution agrees that—
(1) It will comply with all statutory provisions of or applicable to Title IV of the HEA, all applicable regulatory provisions prescribed under that statutory authority, and all applicable special arrangements, agreements, and limitations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program;
(2) As a fiduciary responsible for administering Federal funds, if the institution is permitted to request funds under a Title IV, HEA program advance payment method, the institution will time its requests for funds under the program to meet the institution's immediate Title IV, HEA program needs;
(3) It will not request from or charge any student a fee for processing or handling any application, form, or data required to determine a student's eligibility for, and amount of, Title IV, HEA program assistance;
(4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs, together with assurances that the institution will provide, upon request and in a timely manner, information relating to the administrative capability and financial responsibility of the institution to—
(i) The Secretary;
(ii) A guaranty agency, as defined in 34 CFR part 682, that guarantees loans made under the Federal Stafford Loan and Federal PLUS programs for attendance at the institution or any of the institution's branch campuses or other locations;

(iii) The nationally recognized accrediting agency that accredits or preaccredits the institution or any of the institution's branch campuses, other locations, or educational programs;

(iv) The State agency that legally authorizes the institution and any branch campus or other location of the institution to provide postsecondary education; and

(v) In the case of a public postsecondary vocational educational institution that is approved by a State agency recognized for the approval of public postsecondary vocational education, that State agency;

(5) It will comply with the provisions of§ 668.15 relating to factors of financial responsibility;

(6) It will comply with the provisions of§ 668.16 relating to standards of administrative capability;

(7) It will submit reports to the Secretary and, in the case of an institution participating in the Federal Stafford Loan, Federal PLUS, or the Federal Perkins Loan Program, to holders of loans made to the institution's students under that program at such times and containing such information as the Secretary may reasonably require to carry out the purpose of the Title IV, HEA programs;

(8) It will not provide any statement to any student or certification to any lender in the case of an FFEL Program loan, or origination record to the Secretary in the case of a Direct Loan Program loan that qualifies the student or parent for a loan or loans in excess of the amount that the student or parent is eligible to borrow in accordance with sections 425(a), 428(a)(2), 428(b)(1)(A) and (B), 428B, 428H, and 455(a) of the HEA;

(9) It will comply with the requirements of subpart D of this part concerning institutional and financial assistance information for students and prospective students;

(10) In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, it will make available to prospective students, at or before the time that those students apply for enrollment—

(i) The most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements; and

(ii) Relevant State licensing requirements of the State in which the institution is located for any job for which an educational program offered by the institution is designed to prepare those prospective students;

(11) In the case of an institution participating in the FFEL program, the institution will inform all eligible borrowers, as defined in 34 CFR part 682, enrolled in the institution about the availability and eligibility of those borrowers for State grant assistance from the State in which the institution is located, and will inform borrowers from another State of the source of further information concerning State grant assistance from that State;

(12) It will provide the certifications described in paragraph (c) of this section;

(13) In the case of an institution whose students receive financial assistance pursuant to section 484(d) of the HEA, the institution will make available to those students a program proven successful in assisting students in obtaining the recognized equivalent of a high school diploma;

(14) It will not deny any form of Federal financial aid to any eligible student solely on the grounds that the student is participating in a program of study abroad approved for credit by the institution;

(15)

(i) Except as provided under paragraph (b)(15)(ii) of this section, the institution will use a default management plan approved by the Secretary with regard to its administration of the FFEL or Direct Loan programs, or both for at least the first two years of its participation in those programs, if the institution—

(A) Is participating in the FFEL or Direct Loan programs for the first time; or

(B) Is an institution that has undergone a change of ownership that results in a change in control and is participating in the FFEL or Direct Loan programs.

(ii) The institution does not have to use an approved default management plan if—

(A) The institution, including its main campus and any branch campus, does not have a cohort default rate in excess of 10 percent; and

(B) The owner of the institution does not own and has not owned any other institution that had a cohort default rate in excess of 10 percent while that owner owned the institution.

(16) For a proprietary institution, the institution will derive at least 10 percent of its revenues for each fiscal year from sources other than Title IV, HEA program funds, as provided in§ 668.28(a) and (b), or be subject to sanctions described in § 668.28(c);

(17) The Secretary, guaranty agencies and lenders as defined in 34 CFR part 682, nationally recognized accrediting agencies, the Secretary of Veterans Affairs, State agencies recognized under 34 CFR part 603 for the approval of public postsecondary vocational education, and State agencies that legally authorize institutions and branch campuses or other locations of institutions to provide postsecondary education, have the authority to share with each other any information pertaining to the institution's eligibility for or participation in the Title IV, HEA programs or any information on fraud and abuse;

(18) It will not knowingly—

(i) Employ in a capacity that involves the administration of the Title IV, HEA programs or the receipt of funds under those programs, an individual who has been convicted of, or has pled *nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds, or has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(ii) Contract with an institution or third-party servicer that has been terminated undersection 432 of the HEA for a reason involving the acquisition, use, or expenditure of Federal, State, or local government funds, or that has been administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds; or

(iii) Contract with or employ any individual, agency, or organization that has been, or whose officers or employees have been—

(A) Convicted of, or pled*nolo contendere* or guilty to, a crime involving the acquisition, use, or expenditure of Federal, State, or local government funds; or

(B) Administratively or judicially determined to have committed fraud or any other material violation of law involving Federal, State, or local government funds;

(19) It will complete, in a timely manner and to the satisfaction of the Secretary, surveys conducted as a part of the Integrated Postsecondary Education Data System (IPEDS) or any other Federal collection effort, as designated by the Secretary, regarding data on postsecondary institutions;

(20) In the case of an institution that is co-educational and has an intercollegiate athletic program, it will comply with the provisions of§ 668.48;

(21) It will not impose any penalty, including, but not limited to, the assessment of late fees, the denial of access to classes, libraries, or other institutional facilities, or the requirement that the student borrow additional funds for which interest or other charges are assessed, on any student because of the student's inability to meet his or her financial obligations to the institution as a result of the delayed disbursement of the proceeds of a Title IV, HEA program loan due to compliance with statutory and regulatory requirements of or applicable to the Title IV, HEA programs, or delays attributable to the institution;

(22)

(i) It will not provide any commission, bonus, or other incentive payment based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid, to any person or entity who is engaged in any student recruitment or admission activity or in making decisionsregarding the award of title IV, HEA program funds.

(A) The restrictions in paragraph (b)(22) of this section do not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance.

(B) For the purpose of paragraph (b)(22) of this section, an employee who receives multiple adjustments to compensation in a calendar year and is engaged in any student enrollment or admission activity or in making decisions regarding the award of title IV, HEA program funds is considered to have received such adjustments based upon success in securing enrollments or the award of financial aid if those adjustments create compensation that is based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid.

(ii) Notwithstanding paragraph (b)(22)(i) of this section, eligible institutions, organizations that are contractors to eligible institutions, and other entities may make—

(A) Merit-based adjustments to employee compensation provided that such adjustments are not based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid; and

(B) Profit-sharing payments so long as such payments are not provided to any person or entity engaged in student recruitment or admission activity or in making decisions regarding the award of title IV, HEA program funds.

(iii) As used in paragraph (b)(22) of this section,

(C) *Entity or person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid* means—

(1) With respect to an entity engaged in any student recruitment or admission activity or in making decisions about the award of financial aid, any institution or organization that undertakes the recruiting or the admitting of students or that makes decisions about and awards title IV, HEA program funds; and

(2) With respect to a person engaged in any student recruitment or admission activity or in making decisions about the award of financial aid, any employee who undertakes recruiting or admitting of students or who makes decisions about and awards title IV, HEA program funds, and any higher level employee with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds.

(D) *Enrollment* means the admission or matriculation of a student into an eligible institution.

(23) It will meet the requirements established pursuant to part H of Title IV of the HEA by the Secretary and nationally recognized accrediting agencies;

(24) It will comply with the requirements of§ 668.22;

(25) It is liable for all—

(i) Improperly spent or unspent funds received under the Title IV, HEA programs, including any funds administered by a third-party servicer; and

(ii) Returns of title IV, HEA program funds that the institution or its servicer may be required to make;

(26) If the stated objectives of an educational program of the institution are to prepare a student for gainful employment in a recognized occupation, the institution will—

(i) Demonstrate a reasonable relationship between the length of the program and entry level requirements for the recognized occupation for which the program prepares the student. The Secretary considers the relationship to be reasonable if the

number of clock hours provided in the program does not exceed by more than 50 percent the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the State in which the program is offered, if the State has established such a requirement, or as established by any Federal agency; and

(ii) Establish the need for the training for the student to obtain employment in the recognized occupation for which the program prepares the student.

(27) In the case of an institution participating in a Title IV, HEA loan program, the institution—

(i) Will develop, publish, administer, and enforce a code of conduct with respect to loans made, insured or guaranteed under the Title IV, HEA loan programs in accordance with 34 CFR 601.21; and

(ii) Must inform its officers, employees, and agents with responsibilities with respect to loans made, insured or guaranteed under the Title IV, HEA loan programs annually of the provisions of the code required under paragraph (b)(27) of this section;

(28) For any year in which the institution has a preferred lender arrangement (as defined in 34 CFR 601.2(b)), it will at least annually compile, maintain, and make available for students attending the institution, and the families of such students, a list in print or other medium, of the specific lenders for loans made, insured, or guaranteed under title IV of the HEA or private education loans that the institution recommends, promotes, or endorses in accordance with such preferred lender arrangement. In making such a list, the institution must comply with the requirements in 34 CFR 682.212(h) and 34 CFR 601.10;

(29)

(i) It will, upon the request of an enrolled or admitted student who is an applicant for a private education loan (as defined in 34 CFR 601.2(b)), provide to the applicant the self-certification form required under 34 CFR 601.11(d) and the information required to complete the form, to the extent the institution possesses such information, including—

(A) The applicant's cost of attendance at the institution, as determined by the institution under part F of title IV of the HEA;

(B) The applicant's estimated financial assistance, including amounts of financial assistance used to replace the expected family contribution as determined by the institution in accordance with title IV, for students who have completed the Free Application for Federal Student Aid; and

(C) The difference between the amounts under paragraphs (b)(29)(i)(A) and (29)(i)(B) of this section, as applicable.

(ii) It will, upon the request of the applicant, discuss with the applicant the availability of Federal, State, and institutional student financial aid;

(30) The institution—

(i) Has developed and implemented written plans to effectively combat the unauthorized distribution of copyrighted material by users of the institution's network, without unduly interfering with educational and research use of the network, that include—

(A) The use of one or more technology-based deterrents;

(B) Mechanisms for educating and informing its community about appropriate versus inappropriate use of copyrighted material, including that described in§ 668.43(a)(10);

(C) Procedures for handling unauthorized distribution of copyrighted material, including disciplinary procedures; and

(D) Procedures for periodically reviewing the effectiveness of the plans to combat the unauthorized distribution of copyrighted materials by users of the institution's network using relevant assessment criteria. No particular technology measures are favored or required for inclusion in an institution's plans, and each institution retains the authority to determine what its particular plans for compliance with paragraph (b)(30) of this section will be, including those that prohibit content monitoring; and

(ii) Will, in consultation with the chief technology officer or other designated officer of the institution—

(A) Periodically review the legal alternatives for downloading or otherwise acquiring copyrighted material;

(B) Make available the results of the review in paragraph (b)(30)(ii)(A) of this section to its students through a Web site or other means; and

(C) To the extent practicable, offer legal alternatives for downloading or otherwise acquiring copyrighted material, as determined by the institution; and

(31) The institution will submit a teach-out plan to its accrediting agency in compliance with 34 CFR 602.24(c), and the standards of the institution's accrediting agency upon the occurrence of any of the following events:

(i) The Secretary initiates the limitation, suspension, or termination of the participation of an institution in any Title IV, HEA program under 34 CFR 600.41 or subpart G of this part or initiates an emergency action under § 668.83.

(ii) The institution's accrediting agency acts to withdraw, terminate, or suspend the accreditation or preaccreditation of the institution.

(iii) The institution's State licensing or authorizing agency revokes the institution's license or legal authorization to provide an educational program.

(iv) The institution intends to close a location that provides 100 percent of at least one program.

(v) The institution otherwise intends to cease operations.

(c) In order to participate in any Title IV, HEA program (other than the LEAP and NEISP programs), the institution must certify that it—

Servicers have a duty to manage funds and fiscal operations under 34 CFR 668.14 requires:

(2) As a fiduciary responsible for administering Federal funds, if the institution is permitted to request funds under a Title IV, HEA program advance payment method, the institution will time its requests for funds under the program to meet the institution's immediate Title IV, HEA program needs;

(3) It will not request from or charge any student a fee for processing or handling any application, form, or data required to determine a student's eligibility for, and amount of, Title IV, HEA program assistance;

(4) It will establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under the Title IV, HEA programs, together with assurances that the institution will provide, upon request and in a timely manner, information relating to the administrative capability and financial responsibility of the institution to—

    (i) The Secretary;

    (ii) A guaranty agency, as defined in 34 CFR part 682, that guarantees loans made under the Federal Stafford Loan and Federal PLUS programs for attendance at the institution or any of the institution's branch campuses or other locations;

    (iii) The nationally recognized accrediting agency that accredits or preaccredits the institution or any of the institution's branch campuses, other locations, or educational programs;

---

(1) Has in operation a drug abuse prevention program that the institution has determined to be accessible to any officer, employee, or student at the institution; and
(2)
(i) Has established a campus security policy in accordance with section 485(f) of the HEA; and
(ii) Has complied with the disclosure requirements of § 668.47 as required by section 485(f) of the HEA.
(e)
(1) A program participation agreement becomes effective on the date that the Secretary signs the agreement.
(2) A new program participation agreement supersedes any prior program participation agreement between the Secretary and the institution.
(f)
(1) Except as provided in paragraphs (g) and (h) of this section, the Secretary terminates a program participation agreement through the proceedings in subpart G of this part.
(2) An institution may terminate a program participation agreement.
(3) If the Secretary or the institution terminates a program participation agreement under paragraph (f) of this section, the Secretary establishes the termination date.
(g) An institution's program participation agreement automatically expires on the date that—
(1) The institution changes ownership that results in a change in control as determined by the Secretary under 34 CFR part 600; or
(2) The institution's participation ends under the provisions of § 668.26(a) (1), (2), (4), or (7).
(h) An institution's program participation agreement no longer applies to or covers a location of the institution as of the date on which that location ceases to be a part of the participating institution.
(Approved by the Office of Management and Budget under control number 1845-0022)
(Authority: 20 U.S.C. 1085, 1088, 1091, 1092, 1094, 1099a-3, 1099c, and 1141)
[59 FR 22425, Apr. 29, 1994, as amended at 59 FR 34964, July 7, 1994; 63 FR 40623, July 29, 1998; 64 FR 58617, Oct. 29, 1999; 64 FR 59038, Nov. 1, 1999; 65 FR 38729, June 22, 2000; 65 FR 65637, Nov. 1, 2000; 67 FR 67072, Nov. 1, 2002; 73 FR 35492, June 23, 2008; 74 FR 55648, Oct. 28, 2009; 74 FR 55934, Oct. 29, 2009; 76 FR 66950, Oct. 29, 2010; 76 FR 20536, Apr. 13, 2011]

(iv) The State agency that legally authorizes the institution and any branch campus or other location of the institution to provide postsecondary education; and

(v) In the case of a public postsecondary vocational educational institution that is approved by a State agency recognized for the approval of public postsecondary vocational education, that State agency;

53.     Servicers breached their PPA a fiduciary responsible for administering Federal funds when it failed to validate the debt it sought to collect from Government and assert a claim against Relator. Table 5 shows nine education loans servicers could not validate, but reported on national credit reports.

| Table 5 – Enterprise-Navient Entered Nine (9) Student Loans It Could Not Validate as reported on Relator's National Credit Report Despite Disputes Evidence of June 2, 2015 till March 2016 | | | | | |
|---|---|---|---|---|---|
| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan # |
| 0072 | 2/7/2008 | $5,000.00 | 3/31/2016 | $8,620.00 | NYCHP # |
| 0062 | 2/7/2008 | $5,5000.00 | 3/31/2016 | $7,662.00 | NYCHP # |
| 0052 | 6/7/2007 | $10,000.00 | 3/31/2016 | $9,115.00 | ATOM # |
| 0042 | 6/7/2007 | $8,500.00 | 7/1/2010 | $5,934.00 | ATOM # |
| 0032 | 2/6/2007 | $10,543.00 | 3/31/2016 | $22,719.00 | ATOM # |
| 0022 | 12/15/2004 | $10,000.00 | 3/31/2016 | $13,548 | CCNM # |
| 0012 | 12/15/2004 | $8,500.00 | 3/31/2016 | $10,307.00 | CCNM # |
| 0122 | 6/1/2006 | $18,500.00 | 3/31/2016 | $25,181.00 | ATOM # |
| 7107 | 9/16/2003 | $61,439.-- | 3/20/2016 | $22,604.00 | UB # |

54.     Enterprise-Sallie Mae placed nine (9) student loan debts it could not validate onto Relator's national credit report as shown on Table 6 below;

| Table 6 –  Enterprise Sallie Mae place Nine (9) student loans it could not validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 until This Filed Complaint | | | | | |
|---|---|---|---|---|---|
| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan # |
| 0142 | 6/1/2007 | $8,500.00 | 7/1/2010 | 0 | ATOM # |
| 0132 | 2/1/2007 | $10,543.00 | 7/1/2010 | 0 | ATOM # |
| 0192 | 8/1/2008 | $12,000.00 | 10/1/2009 | 0 | NYCHP # |
| 0182 | 8/1/2008 | $8,500.00 | 10/1/2009 | 0 | NYCHP # |
| 0112 | 12/1/2004 | $10,000.00 | 8/1/2010 | 0 | UB |
| 0102 | 12/1/2004 | $8,500.00 | 8/1/2010 | 0 | UB |
| 0172 | 2/1/2008 | $5,000.00 | 7/1/2010 | 0 | NYCHP |
| 0162 | 2/1/2008 | $5,500.00 | 7/1/2010 | 0 | NYCHP |
| 0152 | 6/1/2007 | $10,000.00 | 7/1/2010 | 0 | |

55.    Enterprise-ECMC placed two (2) student loan debts it could not validate onto Relator's national credit report as shown on Table 8 below

| Table 8 – Enterprise-ECMC placed two (2) student loans it could not validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 Till This Filed Complaint | | | | | |
|---|---|---|---|---|---|
| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan |
| 2568 | 6/27/2013 | $21,346.00 | 4/2/2016 | $21,346.00 | Unknown |
| 2568 | 6/27/2013 | $12,682.00 | 4/2/2016 | $16,198.000 | Unknown |

56.    Enterprise-Student Assistance Foundation placed two (2) student loan debts it could not validate onto Relator's national credit report as shown on Table 9 below

| Table 9 – Enterprise-Student Assistance Foundation placed two (2) Student Loans it could not validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 Till This Filed Complaint | | | | | |
|---|---|---|---|---|---|
| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan |
| 3SF0 | 1/2/2004 | $10,000.00 | 7/31/2013 | $16,377.00 | UB |
| 3SF0 | 1/2/2008 | $8,500.00 | 7/31/2013 | $12,428.00 | UB |

## IV.    ECMC MADE FRAUDULENT AND FALSE STATEMENTS TO CONFISCATE FEDERAL TAX REFUND, GARNISHED SSA RETIREMENT INCOME

U.S. Higher Education Act of 1965, its amendments §§485(b), et al., enforcement regulations; 34 CFR 99.10(d)(2), 34 CFR 99, 34 CFR 674.31, 20 U.S.C. 1232g, 34CFR 685.42(b); 34 CFR 682.402, 34 CFR 682.402(2); 20 U.S. Code § 1080 - Default of student under Federal loan insurance program.

The Treasury Offset Program, administered by the Bureau of the Fiscal Service's Debt Management Services (DMS), to collect delinquent debts owed to federal agencies and states, in accordance with 26 U.S.C. § 6402(d) (collection of debts owed to federal agencies), 31 U.S.C. § 3720A (reduction of tax refund by amount of the debts); Federal Fair Debt Collection Practices Act §§ 1692, 1692G(a), (b), (f) et. seq., Racketeering Influence Corrupt Practices Act 18 U.S.C. 1962 mail, wire and extortion/fraud, Civil Rights Act 42 U.S.C. 1981 and 18 U.S.C. 1001.

57.    ECMC provided information and evidence to U.S. Treasury Department under federal non-tax debt to enforce its Garnishment laws.

58.     The Enterprise made material misrepresentations to the U.S. Treasury

Department 5/6/2015, 7/8/2015, 8/2015 and 9/2015 to garnish Social Security Retirement income to allege

an education loan debt was due and owing.

59.     The Enterprise made material misrepresentations to the Internal Revenue

Service to offset her 2014 Federal Tax refund alleging it was collecting a non-tax federal debt.

60.     The Enterprise-ECMC failed to provide a means for Relator to rehabilitate

student loans it defaulted without advance Notice.

61.     The Enterprise-ECMC knowingly presented and/or made, or caused to be

presented or made, the false claims to the U.S. Department of Education, Internal Revenue Service and

to the U.S. Department of the Treasury and to Consumer Financial Protection Bureau statements at

issue involving fraudulent unauthorized student loan certifications using their Program Participation

Agreements with the federal student aid programs authorized by Title IV of the Higher Education Act of

1965, as amended (Title VI, HEA Programs).

62.     The Enterprise presented and/or made numerous false claims, statements

and prepared written documentation in order to obtain eligibility to participate in Title IV, HEA

programs, allege student loan debt it claimed were valid; it did so without validating the wrongful debt

it sought to collect from Relator(s) who disputed the debts beginning June 5, 2015 till today

63.     It is alleged that the Enterprise, Agencies and Academic Institutions

conspired to and did inflated the student loan debt for one Relator from $64,922.70 up to over $81,000.

64.     Inflated student loan debts occurred due to Academic Institutions organized

as for Profit and Non-Profit used the identity and personal characteristics to submit unauthorized loan

certifications to federal and through states of Florida and New York's Higher Education organizations to

make it appear the authorizations were legitimate to receive student loan disbursement the Relator did

not authorize, was not attending or otherwise did not authorize the amount of funds the Academic

Institution received.

65.     Assessed interest and fees that increased debts beyond the Relator's agreed

And disclosed interest rate also enlarged debt.

66.     The Enterprise, Agency and Academic Institutions collectively conspired to collect unlawful debts using the U.S. Postal Mails, wire and extortion tactics prohibited by law particularly whence it failed to comply with the Federal Fair Debt Collection Practices Act which required it validate the alleged debt within five (5) days of the written complaint The Enterprise received on June 5, 2015, or thereabout.

V.     CREDIT REPORTING AND DEBT COLLECTION AGENCIES

The keystone rights created by the FCRA are the rights of consumers to learn about adverse information and false or inaccurate information in their own consumer reports and to seek correction of that information. See *Fair Credit Reporting, S. Rep. No. 91-517, at 1-2 (1969)*. That legislative structure reflects congressional judgment that sunlight is the best disinfectant. The transparency requirements are envisioned as the principal mechanism for policing industry conduct, enlisting consumers themselves in the process of overseeing the statutory requirements of reasonable accuracy and appropriate disclosure.

To reinforce the statutory obligations of reasonableness and transparency, Congress enabled consumer suits where consumer reporting agencies acted negligently or willfully. While preempting state tort suits in most cases, Congress also provided a comprehensive suite of federal statutory remedies. As originally drafted, Congress authorized actual damages, court costs, and attorneys' fees for negligent violations, see Pub. L. 91-508, § 617, 84 Stat. at 1134 (codified as amended at 15 U.S.C. § 1681o), and enhanced these remedies with the option for punitive damages for willful violations, see id. § 616, 84 Stat. at 1134 (codified as amended at 15 U.S.C. §1681n).

67.     Servicer violated Relator's credit reporting and debt collection rights under law.

VI.   UNVALIDATED FALSE ENTRIES ENTERPRISE PLACED ONTO RELATOR'S NATIONAL
      CREDIT REPORTS

68. Enterprise could not validate alleged student loan debt.

69. Enterprise-Navient placed nine (9) student loan debts it could not validate onto Relator's

    national credit report as shown on Table 5 below, two of which were refunded, e.g. 0072

    and 0062; See Exhibit 5:

| Table 5 – | | | | | |
|---|---|---|---|---|---|
| Enterprise-Navient Entered Nine (9) Student Loans It Could Not Validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 till this Filed Complaint | | | | | |
| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan # |
| 0072 | 2/7/2008 | $5,000.00 | 3/31/2016 | $8,620.00 | NYCHP # |
| 0062 | 2/7/2008 | $5,5000.00 | 3/31/2016 | $7,662.00 | NYCHP # |
| 0052 | 6/7/2007 | $10,000.00 | 3/31/2016 | $9,115.00 | ATOM # |
| 0042 | 6/7/2007 | $8,500.00 | 7/1/2010 | $5,934.00 | ATOM # |
| 0032 | 2/6/2007 | $10,543.00 | 3/31/2016 | $22,719.00 | ATOM # |
| 0022 | 12/15/2004 | $10,000.00 | 3/31/2016 | $13,548 | CCNM # |
| 0012 | 12/15/2004 | $8,500.00 | 3/31/2016 | $10,307.00 | CCNM # |
| 0122 | 6/1/2006 | $18,500.00 | 3/31/2016 | $25,181.00 | ATOM # |
| 7107 | 9/16/2003 | $61,439.-- | 3/20/2016 | $22,604.00 | UB # |

70. Enterprise-Sallie Mae placed nine (9) student loan debts it could not validate onto Relator's

    national credit report as shown on Table 6 below;

| Table 6 – | | | | | |
|---|---|---|---|---|---|
| Enterprise Sallie Mae place Nine (9) student loans it could not validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 until This Filed Complaint | | | | | |
| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan # |
| 0142 | 6/1/2007 | $8,500.00 | 7/1/2010 | 0 | ATOM # |
| 0132 | 2/1/2007 | $10,543.00 | 7/1/2010 | 0 | ATOM # |
| 0192 | 8/1/2008 | $12,000.00 | 10/1/2009 | 0 | NYCHP # |
| 0182 | 8/1/2008 | $8,500.00 | 10/1/2009 | 0 | NYCHP # |
| 0112 | 12/1/2004 | $10,000.00 | 8/1/2010 | 0 | UB |
| 0102 | 12/1/2004 | $8,500.00 | 8/1/2010 | 0 | UB |
| 0172 | 2/1/2008 | $5,000.00 | 7/1/2010 | 0 | NYCHP |
| 0162 | 2/1/2008 | $5,500.00 | 7/1/2010 | 0 | NYCHP |
| 0152 | 6/1/2007 | $10,000.00 | 7/1/2010 | 0 | |

71. Enterprise-ECMC placed two (2) student loan debts it could not validate onto Relator's

national credit report as shown on Table 8 below

Table 8 –

Enterprise-ECMC placed two (2) student loans it could not validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 Till This Filed Complaint

| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan |
|---|---|---|---|---|---|
| 2568 | 6/27/2013 | $21,346.00 | 4/2/2016 | $21,346.00 | Unknown |
| 2568 | 6/27/2013 | $12,682.00 | 4/2/2016 | $16,198.000 | Unknown |

72. Enterprise-Student Assistance Foundation placed two (2) student loan debts it or Navient its

predecessor could not validate onto Relator's national credit report as shown on Table 9

below and as shown on Exhibit 4, Credit Report Analysis and Credit Report.

Table 9 –

Enterprise-Student Assistance Foundation placed two (2) Student Loans it could not validate On Relator's National Credit Report Despite Disputes Since June 2, 2015 Till This Filed Complaint

| Account # last 4 | Opened | Amount | Reported | Balance | Disputed Loan |
|---|---|---|---|---|---|
| 3SF0 | 1/2/2004 | $10,000.00 | 7/31/2013 | $16,377.00 | UB |
| 3SF0 | 1/2/2008 | $8,500.00 | 7/31/2013 | $12,428.00 | UB |

## COUNT 4

## CIVIL RACKETEERING INFLUENCE CORRUPT PRACTICES ACT

73.     Racketeer Influenced and Corrupt Organizations Act claimant need pled that each defendant owed her legal duty in order to plead a prima facie civil claim under RICO 18 U.S.C.A. §1962(c) – Chambers v. King Buick GMC, LLC 43 F. Supp. 3d 575.

74.     U.S. Department of Education/Navient, Ms. Engberg; ECMC, Pam Esaw; AlliedInterstate, LLC and Account Control Technologies, Inc., owed Relator a legal duty to under the U.S. Higher Education Act of 1965 and the FFDCPA to validate the alleged student loan debt to ensure the money each sought to collect was a legally valid debt that Relator authorized, approved and received.  Each breached the duty owed.

### The Purpose of RICO

75.     RICO does not prohibit any conduct which is not already illegal. In enacting RICO, Congress intended to combat the perceived infiltration of organized crime into legitimate business. To achieve this goal, RICO provides enhanced criminal sanctions and civil liability for specified conduct (the *predicate acts of racketeering activity)* which are already prohibited by other state or federal criminal laws—where the conduct amounts to a *pattern of racketeering activity* in relation to an *enterprise.  Agency, private parties and consumer collection agencies engaged in Mail and Wire Fraud throughout this fraudulent student loan alleged debt.*

### THE ELEMENTS OF A RICO CLAIM

76.   RICO is codified in title 18, the United States Criminal Code, at sections 1961 through 1968. Reviewing this statute, the United States Court of Appeals for the Seventh Circuit observed that RICO "is constructed on the model of a treasure hunt.[i]

## Summary of 18 U.S.C"1961-1968

'1961          Definitions

(1)Racketeering Activity (the "Predicate acts"):

(A)     Any act or threat involves in pertinent part *extortion*, which is chargeable under State law and punishable by imprisonment for more than one year; or

(B)     Any act in pertinent part shown below which is indictable under any of the following provisions of title 18, United States Code: (a) **mail, (b) wire fraud, (c) obstruction of justice or obstruction of criminal investigation,** racketeering (the Hobbs Act).  The most common types of predicate acts used in commercial cases are *mail* and *wire fraud* as occurred.  See U.S. Department of Education/Navient, Ms. Engbert; ECMC, Ms. Esaw; AlliedInterstate, LLC and Account Control Technologies, Inc., correspondence – Consumer Financial Protection Bureau Case # 160202-000383.

### Mail and Wire Fraud

77.     Mail fraud is prohibited by 18 U.S.C '1341, and wire fraud is prohibited by 18 U.S.C. '1343. The fraud language in these two sections is identical, and the elements of these violations are (1) the existence of a scheme to defraud; (2) the defendant's knowing participation in that scheme; and (3) the use of the mail or wires in furtherance of that scheme[14]. To successfully bring a claim under RICO, a plaintiff must establish a RICO enterprise and a pattern of racketeering activity. 18 U.S.C.A. §1962 – Spadaro v. City of Mimamar, 855 F.Supp. 2d. 1317.

78.     Defendants used the U.S. Postal Mail and wire more than 50 times to collect an unlawful debt; receive payment from the Government it used more than eight times to get paid; and they were paid more than $53,000 in unauthorized certifications that used Relator's identity and personal characteristics without approval or consent.

[14] South Atlantic td. V. Riese, 284 F.3d 518 (4th Cir. 2002).

### The Scheme To Defraud

79.     "Fraud" as used in the mail and wire fraud statutes is broader, in criminal prosecutions,

than the common law definition of fraud.[15] In a criminal case, specific intent to defraud is required, but it

is generally unnecessary to prove that the intended victim relied on the fraud and was injured. In civil

RICO cases, the federal courts have required proof of common law fraud (plus the additional element of

using the mails or wires) to establish these predicate acts.

80.     U.S. Department of Education/Navient, Ms. Engberg; ECMC, Ms. Esaw, AlliedInterstate,

LLC and Account Control Technologies, Inc., used the U.S. Postal Mails. Exhibits     and wire     to

collect this allegedly fraudulent series of student loan falsely.

81.     The Enterprise and Agencies used the U.S. Postal Mails and wire 50 or more times

between 3/2015 through 3/2016 attempting to collect an unlawful debt.

82.     Defendant's actions caused plaintiffs to be injured in their business or property [money]

that they took without authorization or cheated the Government to obtain through use of the U.S.

Postal Mails and wire communications.

83.     Defendant's actions constituted a pattern of racketeering activity or collection of an

unlawful debt that totaled at least more than $50,000.00.

84.     Plaintiffs' are persons.

85.     The Enterprise conducted or participated in the conduct of the affairs of an enterprise

as defined under the statute RICO proscribes certain conduct with an organizational nexus.  This

organizational nexus is manifested in an enterprise concept. The existence fo a RICO enterprise via the

structure that is distinct from the pattern of racketeering activity that is identified in the particular

RICO violation, e.g., mail, wire fraud, and collection of an unlawful debt obtained by submission of false

certifications to the Government to get paid.  The enterprise used the external Government system to

---

[15] Regency Communications, Inc. v. Cleartel Communications Inc., 160 F.Supp.2d 36, 44 (D.D.C. 2001); McEvoy
Travel Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786 (1st Cir. 1990), cert. den. ill S.Ct. 536.

gain access to NSDLS, through that computerized system, it gained access to MPN's of Relator and to the Financial Aid Transcript to record fraudulent alleged education loan debts.

86.     Defendants shared a purpose, to get paid or to collect an unlawful debt which it received.

87.     Defendants have a continuity of structure in that each are separate entities that work together as shown on the FAT and national credit reports to report false education loan information to get paid by the Government, relator and insured federal debts through default.

88.     Plaintiffs and Relator were injured in their property [money] through the collection of unlawful debts.

89.     Relator was injured in property due to the commission of the predicate acts in connection with the conduct of the Enterprise whose harm was the proximate cause by the predicate acts of defendants.

# COUNT 5

## Obstructing *Administrative Proceedings* (18 U.S.C. 1505)

90.     Obstruction of justice is the impediment of governmental activities. There are a host of federal criminal laws that prohibit obstruction of justice,  the six most general outlaw obstruction of judicial proceedings, with specific emphasis on witness retaliation (18 U.S.C. 1513) and obstruction of congressional or administrative proceedings (18 U.S.C. 1505) conspiracy to defraud the United States.

91.     Prosecutions under §1505 have been relatively few, at least until recently, and most of these arise as obstructions of administrative proceedings.[16]

"The crime of obstruction of [such] proceedings has three essential elements.

*First*, there must be a proceeding pending before a department or agency of the United States. [*Consumer Financial Bureau Protection was contacted with Relator(s) complaint about fraudulent student loan debt on or about March 15, 2016.*]

[16] E.g., United States v. Safavian, 528 F.3d 957, 967-68 (D.C. Cir. 2008); United States v. Kay, 513 F.3d 432, 454 (5th Cir. 2007); United States v. Blackwell, 459 F.3d 739, 761 (6th Cir. 2006); United States v. Quattrone, 441 F.3d 153, 174 (2d Cir. 2006); United States v. Bhagat, 436 F.3d 1140, 1146 (9th Cir. 2006).

*Second*, the defendant must be aware of the pending proceeding. [The Enterprise, Agencies and AI's were aware Relator(s) was reviewing student loan alleged debts and all provided written forms of communications evidencing their awareness].
*Third*, the defendant must have knowingly endeavored corruptly to influence, obstruct or impede the pending proceeding."[17]  The Enterprise has knowingly endeavored to corruptly influence, obstruct or impede the investigative pending proceeding of the Consumer Financial Protection Bureau by failing to validate the alleged student loan debt shown to be fraudulent by evidence it has not disputed, it impeded the investigation by withholding evidence and information about the refunded two loans that occurred February 4, 2009; for the past seven years.

92.     Perhaps due to the breadth of judicial construction, the question of what constitutes a pending proceeding has arisen most often. Taken as a whole, the cases suggest that a "proceeding" describes virtually any manner in which an administrative agency proceeds to do its business. The District of Columbia Circuit, for example, has held that an investigation by the Inspector General of the Agency for International Development may qualify as a "proceeding" for purposes of §1505. In doing so, it rejected the notion "that §1505 applies only to adjudicatory or rule-making activities, and does not apply to wholly investigatory activity."[18]  Moreover, proximity to an agency's adjudicatory or rule-making activities, such as auditors working under the direction of an officer with adjudicatory authority, has been used to support a claim that an obstructed agency activity constitutes a proceeding.[19]  The courts

---

[17]  3 United States v. Price, 951 F.2d 1028, 1031 (9th Cir. 1991), citing United States v. Sutton, 732 F.2d 1483, 1490 (10th Cir. 1984) and United States v. Laurins, 857 F.2d 529, 536-37 (9th Cir. 1988); see also United States v. Warshak, 631, F.3d 266, 325 (6th Cir. 2010); United States v. Blackwell, 459 F.3d 739, 761-62 (6th Cir. 2006); United States v. Quattrone, 441 F.3d 153, 174 (2d Cir. 2006); United States v. Bhagat, 436 F.3d 1140, 1147 (9th Cir. 2006); United States v. Kay, 513 F.3d 432, 454 (5th Cir. 2007).
[18]  United States v. Kelley, 36 F.3d 1118, 1127 (D.C.Cir. 1994). The court also observed that "other courts have held that agency investigative activities are proceedings within the scope of [section] 1505. In those cases, the investigations typically have involved agencies with some adjudicative power, or with the power to enhance their investigations through the issuance of subpoenas or warrants," id.
[19]  United States v. Quattrone, 441 F.3d 153, 175 (2d Cir. 2006)("Quattrone's Brief could be read as raising a distinction between the informal and formal stages of the SEC investigation and whether criminal liability for obstructing an agency 'proceeding' can only arise in the context of the latter. In our view, that argument comes up short"); United States v. Technic Services, Inc., 314 F.3d 1031, 1044 (9th Cir. 2002)("However, the record shows that TSI's conduct, while removing the asbestos at the pulp mill, was under investigation by the EPA at the relevant time ... An investigation into a possible violation of the Clean Air Act or Clean Water Act, which could lead to a civil or criminal proceedings is a kind of proceeding"); United States v. Leo, 941 F.2d 181, 198-99 (3d Cir. 1991)("the government ... argues that the agency that Badolate obstructed acted under the direction of the Army's contracting officer, who had the authority to make adjudications on behalf of the Defense Department.... Other courts of appeals have broadly construed the term 'proceeding' as that term is used in §1505. The Sixth Circuit, in United States v. Fruchtman, 421 F.2d 1019, 1021 (6th Cir. 1970) rejected the contention that the word 'proceedings' refers only to those steps before a federal agency that are judicial or administrative in nature. The Tenth Circuit, in

seem to see comparable breadth in the congressional equivalent ("obstructing the due and proper exercise of the power of inquiry" by Congress and its committees).[20]

93.    In the case of either congressional or administrative proceedings, §1505 condemns only that misconduct which is intended to obstruct the administrative proceedings or the due and proper exercise of the power of inquiry.[21] In order to overcome judicially-identified uncertainty as to the intent required,[22] Congress added a definition of "corruptly" in 1996: "As used in §1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information," 18 U.S.C. 1515(b). Examples of the type of conduct that have been found obstructive vary.[23]

---

United States v. Browning, Inc., 572 F.2d 720, 724 (10th Cir. 1978), wrote: 'In sum, the term proceeding is not ... limited to something in the nature of a trial. The growth and expansion of agency activities have resulted in a meaning being given to proceeding which is more inclusive and which no longer limits itself to formal activities in a court of law. Rather, the investigation or search for the true facts ... is not to be ruled as a non-proceeding simply because it is preliminary to indictment and trial.' See also ... Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966)('Proceedings before a governmental department or agency simply mean proceeding in the manner and form prescribed for conducting business before the department or agency ... '). Given the broad meaning of the word 'proceeding' and the Defense Contract Audit Agency's particular mission, we agree with the government that when Badolate obstructed Stern's search for the true purchase order dates, Badolate obstructed a proceeding within the meaning of §1505").

[20] United States v. Mitchell, 877 F.2d 294, 300-301 (4th Cir. 1989)("The question of whether a given congressional investigation is a 'due and proper exercise of the power of inquiry' for purposes of [section] 1505 cannot be answered by a myopic focus on formality. Rather, it is properly answered by a careful examination of all the surrounding circumstances. If it is apparent that the investigation is a legitimate exercise of investigative authority by a congressional committee in an area within the committee's purview, it should be protected by [section] 1505. While formal authorization is certainly a factor that weighs heavily in this determination, its presence or absence is not dispositive. To give [section 1505] the protective force it was intended, corrupt endeavors to influence congressional investigations must be proscribed even when they occur prior to formal committee authorization").

[21]  United States v. Leo, 941 F.2d 181, 199 (3d Cir. 1991); United States v. Mitchell, 877 F.2d at 299; United States v. Laurins, 857 F.2d 529, 536-37 (9th Cir. 1988)

[22]  United States v. Poindexter, 951 F.2d 369 (D.C.Cir. 1991)(holding that ambiguity of the term "corruptly" in the context of 1505 rendered it unconstitutionally vague at least when applied to false statements made directly to Congress).

[23]  United States v. Blackwell, 459 F.3d 739, 761 (6th Cir. 2006)(submission of inaccurate information pursuant to an Securities and Exchange Commission subpoena); United States v. Bhagat, 436 F.3d 1140, 1149 (9th Cir. 2006) (false statements to SEC investigators); United States v. Technic Services, Inc., 314 F.3d 1031, 1044 (9th Cir. 2002) (tampering with air monitoring devices during an Environmental Protection Agency investigation); United States v. Kelley, 36 F.3d 1118, 1127-128 (D.C.Cir. 1994)(enlisting others to lie to AID Inspector General's Office investigators); United States v. Price, 951 F.2d 1028, 1031 (9th Cir. 1991)(using threats to avoid an interview with IRS officials); United States v. Leo, 941 F.2d 181, 198 (3d Cir. 1991)(making false statements to a Defense Department auditor); United States v. Schwartz, 924 F.2d 410 (2d Cir. 1991)(lying to Customs Service officials); United States v. Mitchell, 877 F.2d 294, 299-300 (4th Cir. 1989)(endeavoring to use family relationship to obstruct a congressional investigation); United States v. Laurins, 857 F.2d 529, 536-37 (9th Cir. 1988)(submitting false documentation in response to an IRS subpoena).

94.     Section 1505 offenses are not RICO or money laundering predicate offenses.[24] Section 1505 has neither separate conspiracy provision nor an explicit exterritorial jurisdiction provision. However, conspiracy to obstruct administrative or congressional proceedings may be prosecuted under 18 U.S.C. 371,[25] and the courts would likely find that overseas violations of §1505 may be tried in this country.[26] Moreover, the general aiding and abetting, accessory after the fact, and misprision statutes are likely to apply with equal force in the case of obstruction of an administrative or congressional proceeding.[27] Retaliating Against Federal Witnesses (18 U.S.C. 1513) Congress outlawed retaliation against federal witnesses under §1513 at the same time it outlawed witness tampering under §1512.[28] Although somewhat more streamlined, §1513 shares a number of attributes with §1512. The definitions in §1515 apply to both sections.[29] Consequently, the prohibitions apply to witnesses in judicial, congressional, and administrative proceedings.[30] There is extraterritorial jurisdiction over both offenses.[31] In slightly different terms, both protect witnesses against murder and physical abuse—committed, attempted, conspired, or threatened. Offenses under the two are comparably punished.

95.     The two loans, e.g., 1,2, 3 and 4; are the same loans the  Enterprise and Agencies made material misrepresentations to the *Consumer Financial Protection Bureau* [Exhibit 3–CFPB] to assert it

---

[24] 18 U.S.C. 1961(1), 1956(c)(7).

[25] E.g., United States v. Warshak, 631 F.3d 266, 325 (6th Cir. 2010); United States v. Blackwell, 459 F.3d 739, 748 (6th Cir. 2006).

[26] Cf., United States v. Bowman, 260 U.S. 94, 98 (1922)("We cannot suppose that when Congress enacted the [fraud] statute or amended it, it did not have in mind that a wide field for such fraud upon the government was in private and public vessels of the United States on the high seas and in foreign ports and beyond the land jurisdiction of the United States, and therefore intend to include them in the section"); Ford v. United States, 273 U,.S. 593, 623 (1927) ("a man who outside of a country willfully puts in motion a force to take effect in it is answerable at the place where the evil is done").

[27] 18 U.S.C. 2, 3, 4. E.g., United States v. Leo, 941 F.2d 181, 184 (3d Cir. 1991).

[28] P.L. 97-291, 96 Stat. 1249, 1250 (1982).

[29] 18 U.S.C. 1515(a).

[30] 18 U.S.C. 1515(a)(1)("As used in sections 1512 and 1513 of this title and in this section—(1) the term 'official proceeding' means—(A) a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Claims Court, or a Federal grand jury; (B) a proceeding before the Congress; (C) a proceeding before a Federal Government agency which is authorized by law; or (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce").

[31] 18 U.S.C. 1512(h), 1513(d).

had lawful right to collect without conducting a validation as Relator requested and as required by law; to U.S. Treasury Department to assert a legitimate right to garnish Social Security Retirement income [Exhibit – U.S. Treasury Department] and Internal Revenue Service to assert a legitimate right to offset federal tax refund of Relator [Exhibit – IRS offset refund for 2014].

96.     The Enterprise and Agencies made material misrepresentations to federal government investigative agency in violation of 18 U.S.C. 1001.

## COUNT 6

## 18 U.S.C. 1001 – FALSE STATEMENTS MADE TO FEDERAL ADMINISTRATIVE INVESTIGATORS

97.     18 U.S.C. 1001 (1) provides, falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; (1) administrative matters, including a claim for payment, a matter related to the procurement of property or services, personnel or employment practices, or support services, or a document required by law, rule, or regulation to be submitted to the Congress or any office or officer within the legislative branch shall be liable.

98.     Defendants withheld evidence of refunded federally insured student loans it had it its records as early as February 4, 2009.  Defendants defaulted, asserted right to collect payments for education loans it knew or should have known was obtained using false certifications.

99.     Relator communicated with defendants beginning March 6, 2015.  Relator disputed the alleged education debt.

100.    Relator without success to resolve the issue contacted and complained to the Consumer Financial Protection Bureau, Internal Revenue Service and the U.S. Department of Education Office of the Inspector General.

101.    All federal government agencies conducted investigations between 2/2016 through 3/2016.

102.    During the administrative agencies investigations, defendants failed to disclose their knowledge of the refunded education loans it had since February 4, 2009.

## COUNT 7

## 18 U.S.C. § 371—Conspiracy to Defraud the United States, Navient Concealed Returned Refund; It Received Payment And Enlarged Relator's Debt Unlawfully

103.    The general conspiracy statute, 18 U.S.C. § 371, creates an offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose. (emphasis added). *See* Project, *Tenth Annual Survey of White Collar Crime*, 32 Am. Crim. L. Rev. 137, 379-406 (1995)(generally discussing § 371).

104.    The operative language is the so-called "defraud clause," that prohibits conspiracies to defraud the United States. This clause creates a separate offense from the "offense clause" in Section 371. Both offenses require the traditional elements of Section 371 conspiracy, including an illegal agreement, criminal intent, and proof of an overt act.

105.    Although this language is very broad, cases rely heavily on the definition of "defraud" provided by the Supreme Court in two early cases, *Hass v. Henkel*, 216 U.S. 462 (1910), and *Hammerschmidt v. United States*, 265 U.S. 182 (1924). In *Hass* the Court stated:

105.    The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government . . . (A)ny conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operation and reports as fair, impartial and reasonably accurate, would be to defraud the United

States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation. *Hass*, 216 U.S. at 479-480. In *Hammerschmidt*, Chief Justice Taft, defined "defraud" as follows:

106.    To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt*, 265 U.S. at 188.

107.    The general purpose of this part of the statute is to protect governmental functions from frustration and distortion through deceptive practices. Section 371 reaches "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Tanner v. United States*, 483 U.S. 107, 128 (1987); *see Dennis v. United States*, 384 U.S. 855 (1966). The "defraud part of section 371 criminalizes any willful impairment of a legitimate function of government, whether or not the improper acts or objective are criminal under another statute." *United States v. Tuohey*, 867 F.2d 534, 537 (9th Cir. 1989).

108.    The word "defraud" in Section 371 not only reaches financial or property loss through use of a scheme or artifice to defraud but also is designed and intended to protect the integrity of the United States and its agencies, programs and policies. *United States v. Burgin*, 621 F.2d 1352, 1356 (5th Cir.), *cert. denied*, 449 U.S. 1015 (1980); *see United States v. Herron*, 825 F.2d 50, 57-58 (5th Cir.); *United States v. Winkle*, 587 F.2d 705, 708 (5th Cir. 1979), *cert. denied*, 444 U.S. 827 (1979). Thus, proof that the United States has been defrauded under this statute does not require any showing of monetary or proprietary loss. *United States v. Conover*, 772 F.2d 765 (11th Cir. 1985), *aff'd, sub. nom. Tanner v. United States*, 483 U.S. 107 (1987); *United States v. Del Toro*,

513 F.2d 656 (2d Cir.), *cert. denied*, 423 U.S. 826 (1975); *United States v. Jacobs*, 475 F.2d 270 (2d

Cir.), *cert. denied*, 414 U.S. 821 (1973).

109.   In summary, those activities which courts have held defraud the United States under

18 U.S.C. § 371 affect the government in at least one of three ways:

1.   They cheated the government out of money or property;
2.   They interfered or obstruct legitimate Government activity; or
3.   They make wrongful use of a governmental instrumentality.

110.   AI's lenders and servicers engaged in all three violations of 18 U.S.C. §371.

111.   AI's submitted unauthorized loan certifications, they received over $50,000 dollars

they were not authorized to using Relator's MPN.

112.   AI's collectively received more than $50,000.00 of money from the Government not

authorized by Relator from 2003 till 2016.

113.   Lender asserted default, a right to collect payments from the Government and

Relator that was unlawful;

114.   Servicer withheld returned refund for seven years.  Navient and ECMC both

obstructed legitimate Government activity by misrepresenting the alleged debt with regard to

Navient; and ECMC misrepresented the true alleged debt to two agencies U.S. Treasury Department

and to the Internal Revenue Service to default alleged debts by NYCHP when it had either returned

the loans February 4, 2009 or it had otherwise submitted certifications for loan amounts and

periods not authorized or for more than Relator authorized.


In Conclusion

AI's, lenders and servicer and their personnel breached their PPA's that warrants termination

of their PPA agreements.

REQUESTED RELIEF

<u>CAUSE OF ACTION</u>

*Violations of the False Claims Act*

Realtor incorporates and re-alleges all of the foregoing allegations herein inclusive

of the Introduction, Facts and Complaint.


A. Based upon the acts described above, Defendant knowingly violated on or more of the following:

B. Knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval;

C. Knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

D. The United States, unaware of the falsity of these claims, records, and statements made by the Defendant, and in reliance on the accuracy thereof, paid money to Defendant and/or various highway contractors for the fraudulent claims. These payments were most likely made to the various States under the Federal Aid Highway Program.

E. The United States and the general public have been damaged as a result of Defendant's violations of the False Claims Act.


<u>PRAYER</u>

A. For the reasons set forth above, Relator, on behalf of the United States, respectfully requests this Court finds that Defendants have damaged the United States Government because of its conduct under the False Claims Act.

Relator prays that judgment is enter swiftly against Defendant for all applicable damages, including but not limited to the following:

    i. Actual damages in an amount sufficient to cover the cost to recall and replace every defective guardrail product of Defendant placed on the public roadways of the United States.

    ii. Civil Penalties in an amount of three times the actual damages suffered by the Government.

iii. Relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act.

iv. Attorney's fees and costs awarded to Relator.

v. Pre-judgment and post judgment interest.

vi. All other relief on behalf of the Relator and/or United States Government to which they may be entitled at law or equity.

Respectfully Submitted,

By: Relator
Filed Under Seal
Tel: xxx xxx-xxx
*Relator*

Dated:  July 12, 2016

## CERTIFICATE OF SERVICE

I, Relator, certify that a true and correct copy of the foregoing has been served on counsel for all parties via the Court's CM/ECF system this the 20th day of June 2016.  Additionally, the following parties were served via First Class Mail with tracking :

Hon. Loretta Lynch
Attorney General of the United States
U.S. Dept. of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Connecticut Attorney General
George Jespen, Attorney General
55 Elm Street
Hartford, CT 06106

California Attorney General
**The Attorney General's Office**
California Department of Justice
Attn: False Claims Unit
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

New York Attorney General
Eric Schneiderman, AG
The Capitol – Albany Office
The Capitol Albany, NY 12224-0341

Florida Attorney General
Pam 'Jo' Bondi, Attorney General
Office of Attorney General
State of Florida
The Capitol PL-10
Tallahassee, FL 32399-1050

**U.S. Department of Education**
Office of Inspector General
Attn. Kathleen Tighe, IG
400 Maryland Ave, NW
Washington, DC 20202

_____/s/_____
Relator,
Filed Under Seal.